Michael A. Bliven
Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
mike@blivenlawfirm.com

Robert F. Dwyer, III
Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman, OR 97818
Telephone: (406) 755-6828
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice forthcoming*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
john@lawmontana.com

Steve W. Berman (*pro hac vice forthcoming*)
Meredith S. Simons (*pro hac vice forthcoming*)
Sydney Thomas (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
merediths@hbsslaw.com
sydneyt@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

MICHAEL PEARSON, JAMES SUTER, SILVIA SUTER, ROSA CAVASOS, JEFFREY FLEMING, and JON HALEY, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

AMAZON DATA SERVICES, INC.,

Defendant.

Case No. ______________________

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. PARTIES .......... 4

A. Plaintiffs .......... 4

1. Michael Pearson .......... 4

2. James and Silvia Suter .......... 6

3. Rosa Cavasos .......... 7

4. Jeffrey Fleming .......... 8

5. Jon Haley .......... 9

B. Defendant Amazon Data Services, Inc. .......... 10

III. JURISDICTION AND VENUE .......... 10

IV. STATEMENT OF FACTS .......... 10

A. Exposure to high levels of nitrates is dangerous to human health. .......... 10

B. High levels of nitrates damage the environment. .......... 12

C. The EPA and the Oregon DEQ have established nitrate-related guidelines. .......... 13

D. Groundwater in the LUBGWMA is heavily contaminated with nitrates. .......... 15

E. ADS has contributed to nitrate contamination in the LUBGWMA groundwater that Plaintiffs and Class members rely on for their drinking water. .......... 17

F. Nitrate pollution from ADS has harmed Plaintiffs and the Class. .......... 22

1. Plaintiffs and Class members who rely on private wells have been harmed. .......... 22

2. Plaintiffs and Class members who rely on water drawn from public wells have been harmed. .......... 22

G. Mitigating the harm to which ADS has contributed will require significant resources ........ 23

1. Mitigating harm to well-reliant Plaintiffs and Class members. ........ 24

2. Mitigating harm to Plaintiffs and Class members who rely on public water. ........ 24

V. CLASS ALLEGATIONS ........ 24

A. All requirements of Fed. R. Civ. P. 23(a) are met. ........ 25

B. All requirements of Fed. R. Civ. P. 23(b)(3) are met. ........ 25

COUNT I RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. § 6972(a)(1)(B) ........ 27

COUNT II NEGLIGENCE ........ 28

COUNT III TRESPASS ........ 30

COUNT IV PRIVATE NUISANCE ........ 31

PRAYER FOR RELIEF ........ 32

JURY DEMAND ........ 33

Plaintiffs Michael Pearson, James Suter, Silvia Suter, Rosa Cavasos, Jeffrey Fleming, and Jon Haley (hereinafter "Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

## I. INTRODUCTION

1. Easy and cheap access to clean drinking water is part of the fabric of life in the United States. People living in the United States expect to get clean water when they turn on the kitchen tap. And the State of Oregon has declared that pollution of any of the waters of the State is not a reasonable use of such waters and is contrary to public policy. ORS 468B.020(1). But for tens of thousands of people who live in Oregon's Morrow and Umatilla counties, including Plaintiffs and other Class members, accessing potable water is not so simple because their water is dangerously polluted.

2. For those in the class area who draw their water from private wells, the tap water in their homes is so polluted with nitrates that it is unsafe to drink. At high concentrations, nitrates cause cell damage and lead to birth defects and cancer. Infants are particularly susceptible to methemoglobinemia (or "Blue Baby Syndrome"), a condition caused by nitrate consumption that prevents blood from carrying oxygen and can be fatal. To protect their health, Plaintiffs and Class members whose homes are supplied by private wells must forego the ease of turning on the tap when they need water, and instead rely on bottled water for all drinking, cooking, and other household purposes.

3. Others in the community, who have access to public water that is treated to remove nitrates, are spared some of the health concerns that threaten their well-reliant neighbors. But this access to safe water comes at a significant cost. Compared to people who live in areas with low nitrate contamination, people in Morrow and Umatilla counties face inflated water bills to cover public water departments' expenditures on removing excess nitrates from their water.

4. Defendant Amazon Data Services, Inc. ("ADS") is responsible for contributing to nitrate contamination in Morrow and Umatilla counties. ADS's industrial processes generate millions of gallons of high-nitrate wastewater every year. Rather than properly discarding this wastewater, ADS sends it to the Port of Morrow, a port authority that runs an industrial wastewater treatment and disposal system—even though ADS knows the Port routinely violates the permit that governs its wastewater disposal. These are not sporadic, one-off violations. Since 2015, the Port has violated its permit more than *two thousand times*. And the Port has publicly said it intends to continue violating that permit. Nevertheless, despite knowing that the high-nitrate wastewater it transfers to the Port will be improperly managed, ADS continues partnering with the Port to discard its wastewater.

5. After receiving wastewater from ADS, the Port dumps the water, without first removing the nitrates, directly onto land in Morrow and Umatilla counties. This process is depicted in the image below.

***Image 1. The Port discarding wastewater onto an empty field in December 2023.***



6. Once on the ground, nitrates percolate down to the groundwater of the Lower Umatilla Basin. Plaintiffs and Class members rely on Lower Umatilla Basin groundwater to meet their water needs.

7. Groundwater in the Lower Umatilla Basin, including the groundwater on which Plaintiffs and Class members rely, is so polluted with nitrates that the Oregon Department of Environmental Quality ("DEQ") has declared it a "Groundwater Management Area." The Lower Umatilla Basin Groundwater Management Area (the "LUBGWMA") encompasses approximately 562 square miles of land in northern Morrow and Umatilla counties. Many LUBGWMA residents, including many Class members, are Latino or indigenous. And many live below the federal poverty line.

***Image 2. Lower Umatilla Basin Groundwater Management Area***




8. The Oregon DEQ applies a "Groundwater Management Area" designation to a region only when nitrate concentrations in groundwater samples approach or exceed the federal safe drinking water standard. The federal safety threshold, established by the Environmental

Protection Agency ("EPA"), is set at 10 milligrams per liter ("mg/L"); Oregon's own threshold for establishing a Groundwater Management Area is 7 mg/L. Nitrate levels in the LUBGWMA blow past these safety limits: water samples taken from area wells have revealed nitrate concentrations of over 40 mg/L, more than four times the federal safety threshold and more than five times Oregon's Groundwater Management Area trigger threshold.

9. Plaintiffs now seek to hold ADS accountable for its role in contributing to this pollution. Plaintiffs and other Class members should not be required to tolerate continued exposure to contaminated water or to bear the cost of obtaining non-polluted water.

10. Plaintiffs bring a citizen suit against ADS under the Resource Conservation and Recovery Act seeking injunctive relief that would enable residents of the affected areas to access clean water.

11. In addition to their federal claim, Plaintiffs bring claims of negligence, trespass, and private nuisance under Oregon law.

12. Plaintiffs bring these claims on behalf of themselves and a proposed Class of people who currently own or rent property or reside in the Lower Umatilla Basin Groundwater Management Area.

## II. PARTIES

### A. Plaintiffs

#### 1. Michael Pearson

13. Plaintiff Michael Pearson is a resident of Morrow County, Oregon.

14. Mr. Pearson owns a home located at 70159 Summit Lane, Boardman, Oregon, 97818, which he purchased in 1997. His home draws its water from the Umatilla Basin through a private well. Mr. Pearson and his family depend on their home's well to provide water for drinking, cooking, bathing, and other domestic purposes.

15. In June 2022, Mr. Pearson learned that the Morrow County Commission had declared a local state of emergency over groundwater nitrate pollution that compromised drinking water for many Morrow County residents.

16. Concerned for his family's safety, Mr. Pearson decided to have his well tested for nitrates. Oregon Rural Action ("ORA") performed a test of Mr. Pearson's well; test results showed nitrate levels of 46.8 mg/L—over four times the safe limit of 10 mg/L established by EPA, and more than six times the Oregon GMA trigger threshold of 7 mg/L.

17. In an effort to protect his family from further exposure to unsafe levels of nitrates, Mr. Pearson installed a reverse osmosis filtration system in his well. Local taxpayers paid for Mr. Pearson's filtration system, which was provided to him by Morrow County.

18. However, the filtration system was unable to bring nitrate levels in his well down to safe levels. After installing the filtration system, Mr. Pearson again had water from his kitchen tested. The results from this testing revealed that the treated water had a nitrate concentration of 16.4 mg/L—still more than one-and-a-half times the EPA's safety threshold, and more than twice Oregon's GMA trigger threshold.

19. To ensure his family has access to clean water, Mr. Pearson has now resorted to using bottled water. Every week, Mr. Pearson and his wife use between six and eight five-gallon water bottles for drinking and cooking. Relying on bottled water is inconvenient for Mr. Pearson and his family. For example, when brewing a pot of coffee, Mr. Pearson cannot simply turn on the tap to fill a pot. Instead, he must lift and carry a five-gallon bottle of water weighing 41 pounds from storage, bring the bottle to his kitchen, open the bottle, and pour it into the coffee pot. What's more, the delivery of water has not been on schedule and has been inadequate. Because the delivery driver does not keep a schedule, empty bottles that Mr. Pearson exchanges for full bottles blow off

Mr. Pearson's porch and into his yard; occasionally, these empty bottles also blow into the road. Mr. Pearson has had to call the delivery company on several occasions because they have not brought water as scheduled, or have not brought enough water to satisfy his family's regular household use.

20. ADS's actions, which have contributed to contamination of Mr. Pearson's well with nitrates, are a cause of expenses and inconveniences that Mr. Pearson and his family have endured and continue to endure. The contamination has diminished the value of Mr. Pearson's property, caused him monetary damages, unreasonably interfered with his quiet enjoyment of the property, damaged his cells, and unreasonably exposed Mr. Pearson and his family to an increased risk of disease.

**2. James and Silvia Suter**

21. Plaintiffs James and Silvia Suter are residents of Morrow County, Oregon.

22. Mr. and Mrs. Suter own a home located at 74777 Toms Camp Road, Boardman, Oregon, 97818. Mr. Suter purchased the home in 1999. The Suters's home is not connected to any public water system. The Suters rely on their home's private well to provide water for drinking, cooking, bathing, and other domestic purposes.

23. Mr. Suter had his private well drilled after moving into the home in 1999. In 1999, the water in Mr. Suter's well tested at a nitrate concentration of less than 7 mg/L.

24. After reports surfaced of water contamination in the area, a neighbor recommended that the Suters have their well tested for nitrates. The Suters followed their neighbor's advice and had their well tested for nitrates. The test revealed that the Suters's well water is polluted with nitrates at a concentration of 37.7 mg/L—almost four times higher than the federal safety threshold, and more than five times higher than Oregon's GMA trigger threshold.

25. Seeking safe water, the Suters have investigated drilling a deeper well to access water from a deeper, and hopefully less contaminated, aquifer. Mr. Suter contacted Waterwell Developing & Surveys, LLC to get a quote on the cost to drill a well deep enough to access water not contaminated with nitrates. The company told Mr. Suter that his well would need to be at least 300 feet deep. Drilling such a well would cost $24,000.

26. Mr. and Mrs. Suter currently rely on bottled water for drinking and cooking. They use between three and four 5-gallon bottles of water each week.

27. ADS's actions, which have contributed to contamination of the Suters's well with nitrates, are a cause of expenses and inconveniences that the couple have endured and continue to endure. The contamination has diminished the value of the Suters's property, caused them monetary damages, unreasonably interfered with their quiet enjoyment of the property, damaged their cells, and unreasonably exposed them to an increased risk of disease.

**3. Rosa Cavasos**

28. Plaintiff Rosa Maria "Rosie" Cavasos is a resident of the city of Boardman, Morrow County, Oregon.

29. Ms. Cavasos owns a home located at 412 SW Goldfinch Lane, Boardman, OR 97818. She purchased this home in July of 2024. She lives at this home with her 34-year-old son, Conrad.

30. Ms. Cavasos's home is supplied with water via the city of Boardman's Water Department. Ms. Cavasos depends on Boardman public water to provide water for drinking, cooking, bathing, and other domestic purposes. Ms. Cavasos pays a monthly water bill for the water she receives from the city of Boardman.

31. Ms. Cavasos did not learn that the public water she relies on sometimes exceeds safe nitrate levels until significantly after the water emergency was declared in Boardman, when she attended a number of community meetings.

32. Out of concern that her water may be unsafe, Ms. Cavasos purchases bottled water from Walmart and Safeway to ensure she has access to clean, safe drinking water. Ms. Cavasos uses this water for cooking and making coffee, but she finds that using bottled water for these purposes is inconvenient and expensive. Her household uses two cases (either a 24-pack or a 36-pack) of 16oz bottles per week. She sometimes purchases even more bottles of water for a holiday like Thanksgiving. Ms. Cavasos spends at least $30 per month on bottled water.

33. ADS's actions, which have contributed to contamination of Ms. Cavasos's tap water with nitrates, are a cause of expenses and inconveniences that Ms. Cavasos and her family have endured and continue to endure. The contamination has caused Ms. Cavasos monetary damages and unreasonably interfered with the quiet enjoyment of her home.

**4. Jeffrey Fleming**

34. Plaintiff Jeffrey Fleming is a resident of Morrow County, Oregon.

35. Plaintiff Fleming owns a home located in Irrigon, Oregon. He lives at the home with his wife and children.

36. Plaintiff Fleming's home is not connected to any public water system and he and his family rely on their private well to provide water for drinking, cooking, bathing, and other domestic purposes.

37. In 2024, Plaintiff Fleming's well tested at a nitrate concentration of 15 mg/L—5 mg/L above the EPA's safety threshold for safe drinking water.

38. Plaintiff Fleming was surprised to learn that his water was contaminated with nitrates and subsequently began purchasing bottled water to drink rather than drinking the well

water, before ultimately applying for and being approved to receive bottled water from Morrow County. Although he no longer has to pay for the bottled water, he does have to store it, which is less convenient than his formerly drinkable well water. Plaintiff Fleming further had a reverse osmosis system installed below his kitchen sink but doubts that this is sufficient to ensure safe water for him and his family.

39. ADS's actions have contributed to contamination of Plaintiff Fleming's property with nitrogen. The contamination has interfered with Plaintiff Fleming's quiet enjoyment of his property, caused him to pay out of pocket costs for his reverse osmosis system, damaged his cells, and unreasonably exposed him and his family to an increased risk of disease.

**5. Jon Haley**

40. Plaintiff Jon Haley is a resident of Morrow County, Oregon.

41. Plaintiff Haley rents a home located in Irrigon, Oregon. His home is supplied with water via Irrigon's city water system. Haley depends on Irrigon's city water to provide water for drinking, cooking, bathing, and other domestic purposes.

42. Plaintiff Haley was surprised to learn that his water was sometimes contaminated with nitrates and has since purchased bottled water to drink rather than drinking the supplied city water.

43. Using bottled water is inconvenient and expensive. Haley spends at least $50 per month on bottled water, and he must regularly purchase water, bring it home, and store it, rather than just turning on his tap and knowing he is accessing clean water.

44. ADS's actions have contributed to contamination of Haley's water with nitrates. The contamination has interfered with Haley's quiet enjoyment of his property and caused him monetary damages.

**B. Defendant Amazon Data Services, Inc.**

45. Amazon Data Services, Inc. ("ADS") is a company that operates a cloud computing platform. ADS is incorporated in Delaware with its principal place of business in Seattle, Washington. ADS currently operates at least thirteen data centers in the LUBGWMA.

## III. JURISDICTION AND VENUE

46. This Court has jurisdiction over this action under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331 ("RCRA"). This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a). Plaintiffs' state law claims derive from the same common nucleus of operative fact as their RCRA claims, *i.e.*, their federal and state claims all arise from the fact that ADS's conduct has contaminated the groundwater upgradient of Plaintiffs' water sources.

47. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 6972(a) because the events giving rise to the claims in this Complaint occurred in Oregon.

48. In addition, ADS, as well as the EPA and Oregon DEQ, were provided with notice of intent to file this action more than 90 days prior to the filing of this Complaint, as required by 42 U.S.C. § 6972(b)(2)(A). Notice was sent to ADS on March 7, 2024. A copy of the notice was mailed to the Administrator of the EPA, the Regional Administrator of the EPA, and the Oregon Department of Environmental Quality on March 7, 2024. A copy of the notice is attached to and incorporated into this complaint as Exhibit A.

## IV. STATEMENT OF FACTS

**A. Exposure to high levels of nitrates is dangerous to human health.**

49. Ingesting water with nitrate concentrations of more than 10 mg/L causes significant health problems.

50. High doses of nitrates prevent red blood cells from carrying adequate levels of oxygen throughout the body, resulting in cyanosis and asphyxia. Low blood-oxygen levels are particularly dangerous for infants, leading to the development of Blue Baby Syndrome (infant methemoglobinemia), which can be fatal. Babies with this syndrome may turn a blue or grey color as their bodies become starved of oxygen. The condition can progress rapidly to cause coma or death if not treated promptly. Formula-fed infants are especially susceptible to Blue Baby Syndrome if the water used to make their formula is high in nitrates.

51. Nitrate-heavy water is also harmful to older children and adults. Exposure to excess nitrates causes reproductive complications (including preterm birth and birth defects), kidney and spleen disorders, and respiratory diseases. Ingesting high levels of nitrate also causes various cancers, especially colon, kidney, stomach, thyroid, and ovarian cancer.

52. The harm from excess nitrates is not limited to people who have developed acute illnesses. Everyone who ingests high-nitrate water is impacted at the cellular level, even if they do not show obvious outward signs of disease. This is because the body converts approximately 5 to 10% of ingested nitrates into nitrites, and these nitrites form carcinogenic compounds known as nitrosamines.

53. At low levels of nitrate consumption, the body uses dietary antioxidants to prevent nitrates from reacting with secondary amines to form nitrosamines. But when people ingest high levels of nitrates—including by drinking water that has a concentration of greater than 10 mg/L—the high concentration of nitrates interferes with the body's ability to prevent nitrosamine formation. Nitrosamines destabilize DNA and increase its breakage rate, leading to base mispairings and ultimately to cancer development. Each time a nitrosamine encounters (or "hits")

a cell, it causes active DNA damage to that cell. Accumulation of this damage leads to cancer cell formation, as demonstrated in the diagram below.

***Image 3. Example of cancer development after multiple hits from nitrosamine exposure.***




54. Thus, everyone who has consumed water with nitrates in excess of 10 mg/L has been impacted at a cellular level.

**B. High levels of nitrates damage the environment.**

55. In addition to harming human health, excess nitrogen and nitrates in the environment lead to a cascade of ecological issues. When nitrogen reaches a body of water, it stimulates the growth of algae. At moderate levels, algae serve as food for aquatic organisms, but at high levels, excess algae growth blocks sunlight and leads to depletion of oxygen levels in water. This phenomenon, known as eutrophication, has negative consequences for biodiversity, fisheries, and recreational activity. When excess algae die and decompose, hypoxic conditions arise, creating zones where oxygen levels are too low to support marine life. In extreme cases, hypoxia results in large-scale marine death. Beyond these issues, exposure to nitrate directly harms aquatic animals by causing reduced growth, slower maturation, and decreased reproductive success.

56. Terrestrial life also suffers from excess nitrate and nitrogen that permeates the environment. Excess nitrogen disrupts the nutrient balance in soils, creating conditions that are

more favorable for nitrogen-loving plants compared to other species. Over time, this leads to a reduction in plant diversity and encourages the growth of species that thrive in nitrogen-rich environments—some of which may be invasive species—at the expense of native flora. And, although nitrogen can stimulate the growth of certain plants, this growth is often shallow and weak, rendering those plants more susceptible to disease, pests, and environmental stress. Alterations in plant communities subsequently affect herbivores and higher trophic levels that depend on these plants.

57. The Columbia River is beginning to experience these negative effects as a result of excess nitrate. A study of the Hanford reach of the river, just upriver from the LUBGWMA, indicates that nitrates applied to land near the river play an important role in transferring nitrates into the water at concentrations high enough to "negatively interfere with the shoreline aquatic habitat."[1] On information and belief, the nitrates that ADS are contributing to the LUBGWMA, which eventually make their way to the Columbia river, are having similar negative impacts.

**C. The EPA and the Oregon DEQ have established nitrate-related guidelines.**

58. Given the known human health and environmental consequences of nitrate pollution, both the federal government and the State of Oregon have established nitrate-related guidelines.

59. On the federal level, the EPA has declared water unsafe for human consumption when it contains nitrates at a concentration of 10 mg/L or greater. For nitrite (which can form in

[1] Abigail Conner et al., *Groundwater Inflows to the Columbia River Along the Hanford Reach and Associated Nitrate Concentrations*, 3 Frontiers in Water 1 (Apr. 2021).

stagnant nitrate-containing and oxygen-poor water), the limits are even stricter: no more than 1 mg/L is safe for human consumption.[2]

60. On the state level, the Environmental Quality Commission—a five-member panel appointed by the governor of Oregon to serve as the Oregon DEQ policy and rulemaking board—has also addressed the issue of nitrate contamination and established water quality standards. In 2014, the Environmental Quality Commission adopted revisions to Oregon's water quality standards designed to reduce or prevent toxic pollutants in Oregon waterways, set out in Table 40 of Oregon Administrative Rule 340-041-8033. Table 40, established "to protect Oregonians from potential adverse health impacts associated with long-term exposure to toxic substances,"[3] sets a "human health criteria" limit of 10,000 µg/L for nitrate (equivalent to 10 mg/L). The EPA approved Table 40 in an August 4, 2015 letter to Wendy Wiles, the administrator for DEQ's Environmental Solutions Division.[4]

61. In addition to this 10 mg/L standard, Oregon also requires that DEQ designate any area with groundwater nitrate concentrations of 7 mg/L or above (70% of the EPA Maximum Contaminant Level) as a "Groundwater Management Area." The state, through DEQ, directs additional resources to lowering nitrate concentrations in groundwater management areas.

---

[2] World Health Organization, *Guidelines for Drinking Water Quality*, https://www.who.int/docs/default-source/wash-documents/wash-chemicals/nitrate-nitrite-chemical-fact-sheet.pdf?sfvrsn%3D8f174e95_4. (last visited March 25, 2026).

[3] State of Oregon Department of Environmental Quality, *TABLE 30: Aquatic Life Water Quality Criteria for Toxic Pollutants*, https://www.oregon.gov/deq/FilterRulemakingDocs/tables303140.pdf. (last visited March 25, 2026).

[4] Letter from Daniel Opalski to Wendy Wiles (Aug. 4, 2015) at 11, https://www.epa.gov/system/files/documents/2021-11/epa_approval_revised_oregon_wqs_08042015.pdf.

**D. Groundwater in the LUBGWMA is heavily contaminated with nitrates.**

62. Groundwater in the Lower Umatilla Basin, on which Plaintiffs and other Class members rely for their water, has been plagued with high nitrate concentrations for decades. And the problem is getting worse.

63. In the mid-1990s, groundwater samples from monitoring wells in the area showed high levels of nitrate contamination. Nearly 30% of groundwater samples showed nitrate levels that exceeded Oregon's GMA trigger threshold of 7 mg/L, and 23% of groundwater samples showed nitrate levels that exceed the EPA limit of 10 mg/L.

64. Groundwater quality in the LUBGWMA has deteriorated since then, as industrial activity at the Port of Morrow has expanded. Since January 10, 2022, state and local officials have encouraged Morrow and Umatilla County residents who rely on private wells to have their wells tested for nitrates.

65. As of October 31, 2025, 2,069 of the approximately 4,500 residential wells in the LUBGWMA have been tested. Approximately 24 percent of the wells tested in Umatilla County and 44 percent of the wells tested in Morrow County have nitrate levels above 10 mg/L. In total, at least 634 of the residential wells in the area have tested positive for nitrate concentrations above 10 mg/L, and 226 of those wells have nitrate concentrations of more than 25 mg/L—more than twice the EPA's maximum contaminant level. The Oregon Health Authority publishes these figures and reminds residents that "***Nitrate levels above 10 mg/L are unsafe to drink or cook with.***"[5]

[5] Oregon Health Authority, *Nitrate Testing, Treatment, and Water Delivery for the Lower Umatilla Basin*, "Public Health Domestic Well Testing, Nitrate Test Results At or Above 10 mg/L as of October 31, 2025." https://www.oregon.gov/oha/PH/HEALTHYENVIRONMENTS/DRINKINGWATER/SOURCEWATER/DOMESTICWELLSAFETY/pages/data.aspx. (last visited March 25, 2026).

66. Another 421 wells in the LUBGWMA have nitrate concentrations of 5–9.99 mg/L, meaning those wells are at risk of becoming unsafe to use for drinking or cooking if nitrate levels continue to rise.[6]

***Image 5. Results of nitrate testing in private wells as of October 31, 2025.***




67. The State of Oregon has installed filtration systems at about 275 homes whose wells are above the EPA's 10 mg/L limit. At many of the remaining homes, nitrate levels are so high that filtration systems are not sufficient to bring nitrate concentrations within safe levels. The state

[6] *Id.*

is providing those homes with bottled water. In total, 318 households in Morrow County and 288 households in Umatilla County are receiving water delivery.[7]

**E. ADS has contributed to nitrate contamination in the LUBGWMA groundwater that Plaintiffs and Class members rely on for their drinking water.**

68. ADS began operating data centers in the LUBGWMA in 2011. ADS currently operates at least thirteen data centers in the area. Among others, these data centers include PDX 62, 90, and 109, and VA Data Facilities #1 and #4. These data centers rely on high volumes of water to cool their servers and other equipment, using hundreds of thousands of gallons per day. ADS recycles the water it uses for cooling purposes three or four times. On every pass through the system, some of the water evaporates. As a result, contaminants in the water—including nitrates—become more concentrated. After the final pass, when ADS discards the "spent" wastewater, nitrates in the water are so concentrated that they often exceed 10 mg/L.

69. ADS largely disposes of this spent water in one of two ways, both of which contribute to nitrate contamination in the LUBGWMA. First, ADS channels some of its spent water into open-air canals. From there, the wastewater is sprayed directly onto land in the LUBGWMA. Nitrates from this wastewater then percolate to the water table and contaminate the LUBGWMA aquifer, which supplies water to LUBGWMA residents.

70. Second, ADS conveys some of its high-nitrate wastewater from its data centers to the Port of Morrow (the "Port"). The Port, which contracts with ADS and other companies to collect and dispose of millions of gallons of high-nitrogen wastewater, disposes of that wastewater by pumping it to, and dumping it on, local farms. The Port euphemistically refers to this process as "recycling" or "land application."

---

[7] *Id.*

71. The Port is subject to a DEQ permit that prohibits it from dumping more high-nitrogen wastewater on farmland than the soil can absorb. But the Port has flouted its permit for almost two decades, routinely discharging excess nitrogen, failing to monitor the fields where it is dumping, and failing to report serious wastewater leaks. In total, the Port has violated its permit thousands of times. DEQ has repeatedly warned that its dumping impacts groundwater used as drinking water, and that high nitrate concentrations in drinking water "are linked with serious health concerns." Despite these warnings, the Port has publicly declared that it intends to continue dumping high-nitrogen wastewater in violation of its permit.

72. ADS transfers high-nitrogen wastewater to the Port despite knowing that water will be dumped on surrounding farms. Nor does ADS ensure the water it sends the Port is free of excess nitrates: wastewater ADS sent to the Port from VA Data #1 had average nitrate levels of 14.8 mg/L from January 2019 through December 2022; during that same time frame, wastewater from VA Data #4 had average nitrate levels that reached 56.6 mg/L—more than five times the EPA's maximum contaminant levels.

73. ADS's data centers also dramatically increase the total volume of water that the Port land-applies. The Port has limited capacity for storing wastewater, and ADS's LUBGWMA data centers discharge at least 250 million gallons of wastewater to the Port each year. The Port dumps any wastewater it cannot store onto fields in the LUBGWMA, often without processing it to remove nitrates. By taking up significant storage space at the Port, ADS cuts down on the Port's capacity to store and treat other high-nitrate sources, with the end result that the Port land-applies more wastewater—much of which contains unsafe levels of nitrates—than it otherwise would.

74. After receiving wastewater from ADS, the Port land-applies the water to five farms: the Port dumps wastewater from PDX 90 directly onto Farm 2; it dumps wastewater from PDX

109, VA Data #1, and VA Data #4 in the "Pond #41" storage pond and from there onto Farms 1, 3, 4, and 5; and it dumps wastewater from PDX 62 directly onto Farm 3 and indirectly (by way of the "Sand Dune" storage pond) onto Farms 4 and 5.

75. Wastewater that is land applied, including water from open air canals and water that the Port discards, percolates into the soil and contaminates the LUBGWMA groundwater.

76. Wastewater that ADS sends to the Port infiltrates the water supply of residents, renters, and property owners in Boardman, Irrigon, and Hermiston via the following routes:

- PDX 90 Data Center → Farm 2 → Boardman
- PDX 109, VA Data #1, and VA Data #4 Data Centers → Pond #41 storage pond → Farm 1 → Boardman
- PDX 109, VA Data #1, and VA Data #4 Data Centers → Pond #41 storage pond → Farm 3 → Irrigon
- PDX 109, VA Data #1, and VA Data #4 Data Centers → Pond #41 storage pond → Farms 4 and 5 → Hermiston
- PDX 62 Data Center → Farm 3 → Irrigon
- PDX 62 Data Center → Sand Dune storage pond → Farms 4 and 5 → Hermiston

77. Plaintiffs Pearson and Fleming are among those LUBGWMA residents with wells containing nitrates from ADS's wastewater.

78. Mr. Pearson's home is downgradient of Farm 1 and Farm 2. High-nitrate wastewater, including water from ADS, has been dumped on Farms 1 and 2. Nitrates from that wastewater have percolated into groundwater and moved downgradient and into Mr. Pearson's well, which in 2022 had a nitrate concentration of 46.8 mg/L.

79. Mr. Fleming's home is downgradient of Farm 3. High-nitrate wastewater, including water from ADS, has been dumped on Farm 3. Nitrates from that wastewater have percolated into groundwater and moved downgradient and into Mr. Fleming's well, which in 2024 had a nitrate concentration of 15 mg/L.

80. Upon information and belief, wastewater from ADS that is sent to open air canals infiltrates the water supply of additional residents, renters, and property owners in the LUBGWMA, including the Suters's water supply.

81. In addition to private domestic wells, Plaintiffs and Class members who rely on public water systems have also been affected.

82. Plaintiff Cavasos (who relies on the City of Boardman's public water system) and Plaintiff Haley (who relies on the City of Irrigon's public water system) are among those LUBGWMA residents who rely on public water systems that have been affected by nitrates contained in ADS's wastewater. Indeed, all persons who rent or own property that is supplied with water by public water systems in the LUBGWMA have been affected by ADS's disposal of high-nitrate wastewater.

83. Of the 59 active public water systems in the LUBGWMA, 58 (all but the City of Hermiston) rely exclusively on groundwater. The Oregon DEQ has determined that the following public water systems in the LUBGWMA are at "substantial nitrate risk," defined as either having a nitrate-N measurement at or above 10 mg/L or by having the 90th percentile of the nitrate-N measurements greater than 5 mg/L:

***Table 1. LUBGWMA Public Water Systems at "Substantial Nitrate Risk"***

| Public Water System Name | Population | Location | County |
|---|---|---|---|
| Boardman, City of | 3,500 | Boardman, OR 97818 | Morrow |
| Country Garden Estates MHP | 175 | Irrigon, OR 97844 | Morrow |
| Irrigon, City of | 1,885 | Irrigon, OR 97844 | Morrow |
| River Point Farms LLC | 250 | Hermiston, OR 97838 | Umatilla |

*Source: Petition to the EPA submitted on behalf of Food & Water Watch et al., January 16, 2020*

84. As of 2019, multiple public water systems downgradient of sites where ADS's wastewater is land-applied, including systems in Boardman and Irrigon, had tested above the 10 mg/L maximum contamination limit ("MCL") or the 7 mg/L trigger level ("TL") for nitrate at least once.

***Table 2. LUBGWMA Nitrate Exceedances, 2002 to 2019***

| Public Water System Name | Population | Highest Recorded Nitrate Level | Contamination Frequency | County |
|---|---|---|---|---|
| Boardman, City of | 3,921 | 7.5 mg/L | 1 sample > TL | Morrow |
| Country Garden Estates MHP | 175 | 9.8 mg/L | 4 samples > TL | Morrow |
| Herreras Park | 20 | 8.9 mg/L | 6 samples > TL | Morrow |
| Irrigon, City of | 2,019 | 18 mg/L | 26 samples > MCL<br>42 samples > TL | Morrow |
| ODF/WL Irrigon Fish Hatchery | 18 | 40.9 mg/L | 21 samples > MCL<br>48 samples > TL | Morrow |
| River Point Farms LLC | 250 | 28.5 mg/L | 16 samples > MCL<br>23 samples > TL | Umatilla |

*Source: Petition to the EPA submitted on behalf of Food & Water Watch et al., January 16, 2020*

85. Each of these public water systems draws water from wells that are downgradient of sites where ADS's wastewater is land-applied.

86. A well used by the City of Boardman is located off Marine Drive NE in Boardman, at Sailboard Beach. That well is downgradient of Farm 1 and Farm 2.

87. Country Garden Estates Mobile Home Park is located at 81435 Country Garden in Irrigon and is downgradient of Farm 3.

88. The City of Irrigon draws its water from at least two wells, one located on West 4th Street in Irrigon and one located between Steagal Lane and the Columbia River. Both wells are downgradient of Farm 3.

**F. Nitrate pollution from ADS has harmed Plaintiffs and the Class.**

**1. Plaintiffs and Class members who rely on private wells have been harmed.**

89. ADS's actions, which have contributed to nitrate contamination in wells owned by Plaintiff Pearson, Plaintiffs James and Silvia Suter, Plaintiff Fleming, and other Class members, have contributed to significant expenses and inconveniences. Plaintiffs and Class members can no longer safely use the tap water in their homes because they are contaminated with nitrates to which ADS's actions have contributed. Instead, they must rely on bottled water deliveries for all their daily water needs.

90. The nitrate contamination to which ADS has contributed has also diminished the value of residents' property, which is less valuable because they no longer have easy access to clean water.

91. In addition, Plaintiffs and Class members have suffered physical harm as a result of ingesting water high in nitrates. As described above, exposure to excess nitrates causes significant health problems, including cancer and birth defects. Even Class members who have not developed severe diseases, like cancer, have been harmed at a cellular level as a result of their exposure to nitrate in excess of 10 mg/L.

**2. Plaintiffs and Class members who rely on water drawn from public wells have been harmed.**

92. Public water systems are required to test their water for nitrates frequently, and they remove nitrates from groundwater before it is distributed to consumers. As a result, water with excessive concentrations of nitrates only sometimes reaches consumers via public water systems.

Thus, unlike well-reliant residents, Plaintiffs Cavasos and Haley and Public Water Class members who rely on public water systems are mostly assured that their water is safe to drink.

93. However, this assurance comes at a price: public water systems that draw from the affected areas must spend money to remove nitrates from groundwater. These nitrate removal processes are expensive. Building a mid-sized nitrate treatment plant costs $10 to $15 million,[8] and running a nitrate removal plant costs several hundred dollars per day.[9]

94. Public water systems recoup the costs of nitrate removal by passing those costs along to consumers, including Plaintiffs Cavasos and Haley and other Class members who rely on public water. On average, people who live in areas with high levels of nitrate in the local water system pay more than $600 per year extra compared to people who live in areas with low nitrate concentrations, reflecting the cost of removing the nitrate from the water.[10] On information and belief, the water bills of Plaintiffs Cavasos and Haley and other Class members who rely on public water are several hundred dollars higher per year than they would be absent nitrate contamination to which ADS has contributed.

### G. Mitigating the harm to which ADS has contributed will require significant resources.

95. Mitigating the harm to which ADS has contributed—and continues to contribute—to Plaintiffs and Class members should ensure that all households have access to clean tap water,

---

[8] Northeast-Midwest Institute, *NEMWI Releases New Study on the Cost of Nitrate Treatment* https://www.nemw.org/nemwi-releases-new-study-on-the-cost-of-nitrate-treatment-in-the-mississippi-river-basin/. (last visited March 25, 2026).

[9] KCCI, FACEBOOK (July 2, 2025), https://www.facebook.com/kcci8/videos/its-expensive-to-run-central-iowa-water-works-nitrate-removal-facility-how-expen/10019333441476840/.

[10] Emily Moon, *The Cost of Cleaning Up Nitrate Contamination Falls on America's Poorest Counties*, PACIFIC STANDARD (Oct. 2, 2018), https://psmag.com/news/the-cost-of-cleaning-up-nitrate-contamination-falls-on-americas-poorest-counties.

and that people do not pay more for access to clean water via public water systems than they would have absent ADS's disposal of its wastewater.

### 1. Mitigating harm to well-reliant Plaintiffs and Class members.

96. For a majority of well-reliant households within the geographic areas affected by ADS's nitrate pollution, the most effective means of ensuring access to clean tap water is to connect these households to a public water system. Plaintiffs estimate that connecting to a nearby public water system will cost an average of $40,000 per household. In addition, paying for access to public water will cost each household about $1,000 per year—a cost Plaintiffs and other Class members who rely on wells would not need to pay if they were able to continue relying on well water.

97. For households that are too far from a public water system for a hookup to be practical, the best solution is to drill deeper wells to bypass the contaminated alluvial layer and reach the clean water in the underlying basalt layer. Drilling these deeper wells will cost an average of $40,000 per well.

### 2. Mitigating harm to Plaintiffs and Class members who rely on public water.

98. As described above, Plaintiffs and Class members who rely on public water are often assured that their water is safe to drink. Mitigating the harm these individuals have suffered will instead require funding for additional filtration systems to ensure continued access to clean drinking water at consistent prices.

## V. CLASS ALLEGATIONS

99. Plaintiffs bring this action on behalf of themselves and, under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of the following Class: **All persons who currently own or rent property or reside in the Lower Umatilla Basin Groundwater Management Area**.

100. Excluded from the Classes are ADS and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the district judge(s) presiding over this matter and the clerks of said judge(s).

**A. All requirements of Fed. R. Civ. P. 23(a) are met.**

101. A class action is warranted in this case because the members of the Class are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Class; the claims of the representative parties are typical of the claims of the Class; and the Plaintiffs named in this Complaint will fairly and adequately protect the interests of the Class.

102. **Numerosity**: Class members are so numerous (thousands total) that joinder of all Class members in a single proceeding would be impracticable. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

103. **Commonality**: Plaintiffs' claims are common to all members of the Class, and individual complaints otherwise may result in inconsistent or varying adjudications.

104. **Typicality**: The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

105. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that Plaintiffs have no interests adverse to, or that conflict with, the Class which Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex class actions of this nature.

**B. All requirements of Fed. R. Civ. P. 23(b)(3) are met.**

106. In addition to satisfying the prerequisites of Fed. R. Civ. P. 23(a), this case qualifies for class action treatment because questions of law or fact common to the Class predominate over

any questions affecting only individual Class members, and because a class action suit is superior to other available methods for adjudicating the controversy.

107. **Predominance**: Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, but are not limited to:

a) Whether nitrate contaminates the groundwater in the LUBGWMA;

b) Whether ADS's operations have contributed nitrates to contaminate groundwater in the LUBGWMA;

c) Whether the measures ADS has implemented (if any) to prevent nitrate from contaminating the groundwater in the LUBGWMA are effective and sufficient;

d) Whether ADS has violated the Resource Conservation and Recovery Act;

e) Whether ADS has breached a duty of reasonable care in its operations by allowing nitrates to contaminate the groundwater in the LUBGWMA;

f) Whether ADS trespassed on Plaintiffs' and other Class members' property;

g) Whether ADS created a nuisance by unreasonably interfering with Plaintiffs' and Class members' use and enjoyment of their properties;

h) Whether Plaintiffs and the Class members are entitled to equitable relief, including, but not limited to, injunctive relief; and

i) Whether Plaintiffs and other Class members are entitled to damages and other monetary relief and, if so, in what amount.

108. **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by

Plaintiffs and Class members, while substantial, are small compared to the burden and expense that would be required to individually litigate their claims against ADS, so it would be impracticable for Class members to individually seek redress from ADS's wrongful conduct. And, even if Class members could afford individual litigation, the court system could not. Individualized litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I**
**RESOURCE CONSERVATION AND RECOVERY ACT,**
**42 U.S.C. § 6972(A)(1)(B)**

109. Plaintiffs reallege and incorporate by reference the above paragraphs.

110. 42 U.S.C. § 6972(a)(l)(B), under which Plaintiffs bring this claim, is RCRA's citizen enforcement provision. Section 6972(a)(l)(B) authorizes "any person" to seek redress in federal court for risks posed to public health and the environment by "hazardous wastes" and "solid wastes," so long as the defendant falls within one of the categories of entities that Congress declared liable under § 7002(a)(l)(B). Included in § 7002(a)(l)(B) are entities that generated; transported; owned or operated a treatment, storage, or disposal facility; or contributed to "past or present handling, storage, treatment, transportation, or disposal" of the "solid wastes" at issue.

111. ADS's industrial wastewater is a "solid waste" within the meaning of 42 U.S.C. § 6903(27) because the water is discarded material resulting from ADS's industrial operations. ADS's industrial wastewater is also hazardous waste within the meaning of 42 U.S.C. §6093(5) because the water contains high levels of nitrates, which pose a substantial hazard to the health of residents of the LUBGWMA.

112. ADS has generated, transported, stored, and disposed of nitrate-heavy industrial wastewater, a solid waste and hazard as those terms are defined under RCRA, 42 U.S.C. § 6901, et seq., as well as under Oregon state solid and hazardous waste laws and regulations.

113. The presence of hazardous substances and wastes causing nitrate concentrations above the levels and standards allowed by the Oregon DEQ constitutes an imminent and substantial endangerment to human health and the environment and threatens ground water quality in the LUBGWMA.

114. Pursuant to 42 U.S.C. § 6972(b)(2)(A), Plaintiffs notified ADS, the Administrator of the United States Environmental Protection Agency (the "Administrator"), and the State of Oregon of the endangerment more than 90 days in advance of filing this action. Plaintiffs also provided a copy of this Complaint to the Administrator. To Plaintiffs' knowledge, neither the Administrator nor the state of Oregon has commenced any of the actions set forth under 42 U.S.C. § 6972(b)(2)(B), (b)(2)(C).

115. Under 42 U.S.C. § 6972(a)(1)(B), ADS is liable pursuant to 42 U.S.C. § 6972, et seq., for conducting such action as is necessary to abate the endangerment to human health and the environment because they are past and present generators, transporters, and owners or operators of facilities that contribute to the handling, storage, and/or transportation of solid or hazardous waste that now presents an imminent and substantial endangerment to health or the environment.

116. Under 42 U.S.C. § 6972(e), Plaintiffs are entitled to recover costs incurred in bringing this action, including reasonable attorney fees and expert witness fees.

**COUNT II**
**NEGLIGENCE**

117. Plaintiffs reallege and incorporate by reference the above paragraphs.

118. ADS has breached its duty to exercise ordinary care, and that breach contributed to Plaintiffs' and other Class members' injuries.

119. A reasonably careful company would not allow high-nitrate wastewater from its facility to be sprayed onto nearby fields in quantities that cause nitrate contamination of a local aquifer upon which people rely for drinking water. Nor would a reasonably careful company partner with an entity such as the Port of Morrow for wastewater disposal services, given the Port's rampant violations of a wastewater disposal permit intended to protect public health.

120. ADS's operations have contributed and continue to contribute to nitrate contamination in LUBGWMA groundwater, upon which Plaintiffs and the Class rely for clean drinking water.

121. ADS knows nitrates are hazardous to human health.

122. Despite this knowledge, ADS continued to convey its wastewater to the Port of Morrow, a known polluter, contributing to nitrate contamination of groundwater in the LUBGWMA.

123. ADS's decision to engage in activities that they knew or should have known would contribute harm to people living in the LUBGWMA constitutes a breach of ADS's ordinary duty of care.

124. ADS's breach of its duty of care is a substantial factor in causing Plaintiffs' injuries. ADS sends the Port of Morrow millions of gallons of high-nitrate wastewater every year. The more wastewater ADS sends to the Port, the more wastewater the Port dumps in the LUBGWMA. If not for ADS's decision to send millions of gallons of high-nitrate wastewater to the Port of Morrow every year, the Port would not have land-applied those millions of gallons of wastewater on Farms 1–5, and nitrate levels downgradient of those sites would not be as high as they are.

125. As a result of ADS's breach of its duties, Plaintiffs and the Class have suffered injuries and will continue to suffer injuries. Those injuries include increased water prices for people who rely on public water, and a reduction in property values, the inconvenience associated with being unable to use tap water for drinking and cooking, cellular damage caused by exposure to nitrates, and an increased risk of developing life-threatening illnesses for people who rely on well water.

**COUNT III**
**TRESPASS**

126. Plaintiffs reallege and incorporate by reference the above paragraphs.

127. ADS has contributed, and continues to contribute, pollutants, which enter onto real property owned by Plaintiffs and Class members. This trespass was intentional because ADS knew that the entry of pollutants onto Plaintiffs' and Class members' property was certain, or substantially certain, to result from their operations. Despite this substantial certainty, ADS still went ahead with its operations.

128. Such intrusions re-occur many times each day as additional nitrate particles enter onto Plaintiffs' and Class members' property.

129. Publicity surrounding Morrow County's emergency declaration and the Port of Morrow's repeated violations of its wastewater discharge permit, as well as ADS's own awareness of the nitrate contamination issues in the LUBGWMA, put ADS on notice that their operations were contributing nitrates to pollute Plaintiffs' and Class members' properties. It was therefore reasonably foreseeable that its operations would disturb Plaintiffs' and Class members' possessory interests.

130. ADS's trespass is without right or license and violates the exclusive property rights of Plaintiffs and Class members. The pollutants that ADS caused to spread through groundwater

in the LUBGWMA and contribute to contamination of Plaintiffs' and Class members' water constitute an unreasonable interference with possessory use of their respective properties.

131. ADS's intentional trespass has resulted in actual and substantial damages to the real property owned by Plaintiffs and members of the Class because their properties are now contaminated with nitrates.

**COUNT IV**
**PRIVATE NUISANCE**

132. Plaintiffs reallege and incorporate by reference the above paragraphs.

133. ADS's disposal of wastewater has substantially and unreasonably interfered with Plaintiffs' and the Class's use and enjoyment of their land.

134. ADS knew or had reason to know that their actions were contributing to nitrate contamination in the LUBGWMA, thereby interfering with Plaintiffs' and the Class's use and enjoyment of their properties.

135. ADS's actions have in fact contributed to an interference with Plaintiffs' and the Class's use and enjoyment of their properties. Because groundwater in the LUBGWMA is contaminated with nitrates, Plaintiffs are unable to rely on their wells to provide safe drinking water.

136. The utility of excess wastewater dumping and the burden of reducing the amount of nitrates in ADS's water is slight compared with the risk that ADS's conduct would contribute to contamination of Plaintiffs' and the Class's water and substantially interfere with their use and enjoyment of their property.

137. ADS failed to exercise due care to eliminate the risk of nitrates contaminating groundwater in the LUBGWMA.

138. ADS's disposal of wastewater contributed to causing Plaintiffs and the Class personal and property damage in an amount to be proven at trial. ADS's conduct has contributed to contamination that has rendered private wells unfit for use, forcing Plaintiffs and Class members who rely on private wells to either continually expose themselves to an unacceptably high risk of severe illness or rely on expensive and/or cumbersome alternative drinking water sources. Class members have also suffered cellular damage caused by exposure to nitrates and are at an increased risk of developing life-threatening illnesses, including cancer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against ADS as follows:

A. For a declaratory judgment that ADS has violated and continue to be in violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B);

B. For an order of the Court compelling ADS to provide clean, potable water to all members of the Class who rely on wells by connecting them to public water systems or by drilling wells deep enough to provide clean, potable water;

C. For an order of the Court compelling ADS to pay the water bills of members of the Class who are newly connected to public water systems;

D. For an order of the court compelling ADS to conduct and pay for medical monitoring for Class members;

E. For all general and compensatory damages proved and awarded by the jury or this Court;

F. For punitive damages to punish and deter those ADS subject to Or. Rev. Stat. § 31.730;

G. For all other damages allowed by law and awarded by the jury;

H. For Plaintiffs’ litigation costs, including attorney and expert witness fees and other costs, under 42 U.S.C. § 6972(e) or as otherwise allowable by law; and

I. For such other and further relief as the Court deems just and equitable under the circumstances.

**JURY DEMAND**

Plaintiffs hereby demand a jury trial on all claims triable by right.

DATED: March 31, 2026

Respectfully submitted,

By: <u>*/s/ Michael A. Bliven*</u>
Michael A. Bliven, Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Robert F. Dwyer, III, Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
rdwyer@blivenlawfirm.com

Steve W. Berman (*pro hac vice forthcoming*)
Meredith S. Simons (*pro hac vice forthcoming*)
Syndey Thomas (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
merediths@hbsslaw.com
sydneyt@hbsslaw.com

John Heenan (*pro hac vice forthcoming*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

*Attorneys for Plaintiffs and the Proposed Classes*