Michael A. Bliven
Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
mike@blivenlawfirm.com

Steve W. Berman (*pro hac vice forthcoming*)
Meredith S. Simons (*pro hac vice forthcoming*)
Sydney Thomas (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com; merediths@hbsslaw.com;
sydneyt@hbsslaw.com

*Attorneys for Plaintiffs*
*Additional counsel on signature page*

David C. Weber
Oregon State Bar No. 150073
Augustus E. Winkes
Oregon State Bar No. 223347
Casey T. Clausen
Oregon State Bar No. 232287
BEVERIDGE & DIAMOND, PC
600 University Street, Suite 1601
Seattle, WA 98101-3109
Telephone: (206) 315-4800
dweber@bdlaw.com; awinkes@bdlaw.com;
cclausen@bdlaw.com

Nima Mohebbi (*pro hac vice forthcoming*)
Brooklyn Hildebrandt (*pro hac vice forthcoming*)
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9648
nima.mohebbi@sidley.com;
bhildebrandt@sidley.com

*Attorneys for Amazon Data Services, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| MICHAEL PEARSON, JAMES SUTER, SILVIA SUTER, ROSA CAVASOS, JEFFREY FLEMING, and JON HALEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON DATA SERVICES, INC.,<br><br>Defendant. | Case No. 2:26-cv-00633<br><br>**JOINT MOTION FOR PRELIMINARY CERTIFICATION OF SETTLEMENT CLASS, FOR APPOINTMENT OF SETTLEMENT CLASS COUNSEL, AND FOR PRELIMINARY APPROVAL OF SETTLEMENT** |

**TABLE OF CONTENTS**

Page

I. LOCAL RULE 7-1(a) CERTIFICATION...........................................................................1

II. MOTION............................................................................................................................1

III. MEMORANDUM OF LAW .............................................................................................2

    A. Introduction...........................................................................................................2

IV. BACKGROUND ...............................................................................................................3

    A. Basis of the Litigation..........................................................................................3

    B. Negotiation of the Proposed Settlement ..............................................................5

    C. Summary of the Settlement Agreement ................................................................7

        1. Class definition .........................................................................................7

        2. Monetary terms and benefits to the Settlement Class...............................7

        3. Proposed Notice Plan................................................................................8

        4. Release of liability ....................................................................................9

V. STANDARDS FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT...................................................................................................................9

    A. Preliminary approval versus final approval ..........................................................9

    B. Certification of settlement class............................................................................9

    C. When a proposed settlement is fair, reasonable, and adequate...........................10

VI. THE SETTLEMENT CLASS should be preliminarily certified....................................10

    A. The Settlement Class satisfies Rule 23(a)..........................................................10

        1. The Settlement Class is sufficiently numerous.......................................10

        2. Questions of law and fact are common to the Settlement
Class........................................................................................................11

        3. The Class Representatives' claims are typical of the
Settlement Class......................................................................................12

        4. Representation of the Settlement Class is adequate................................13

5.      Settlement Class Members are ascertainable ........................................... 14

B.      The Rule 23(b)(3) requirements are satisfied ....................................................... 14

1.      Common issues predominate ................................................................... 14

2.      A class action is superior ........................................................................ 16

C.      All Plaintiffs should be appointed as Class Representatives ............................... 18

D.      The law firms of Hagens Berman Sobol Shapiro LLP, Heenan &
        Cook, and Bliven Law Firm, PC should be appointed as Settlement
        Class Counsel ...................................................................................................... 18

1.      Counsel's work identifying and investigating potential
        claims ...................................................................................................... 18

2.      Counsel's experience in handling complex litigation .............................. 19

        a.      Hagens Berman ........................................................................... 19

        b.      Heenan & Cook ........................................................................... 19

        c.      Bliven Law Firm ......................................................................... 20

3.      Knowledge of applicable law ................................................................... 20

4.      Resources committed ............................................................................... 20

VII.    THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED ......................... 21

A.      Strength of Plaintiffs' case and the risk, expense, complexity, and
        likely duration of further litigation and maintaining class action
        status through trial ............................................................................................... 22

B.      The amount offered in settlement is reasonable and adequate ............................ 23

C.      The extent of discovery completed and the stage of the proceedings .................. 26

D.      The reaction of the class ...................................................................................... 27

E.      The absence of collusion or other conflicts of interest ....................................... 27

F.      The Settlement Agreement was negotiated at arm's length ................................. 28

G.      The release of claims is reasonable ..................................................................... 29

H.      The covenant not to sue and proposed Bar Order are reasonable ....................... 30

VIII.   THE PARTIES REQUEST THAT THIS COURT DIRECT NOTICE TO
THE SETTLEMENT CLASS ................................................................................ 32

      1.    The proposed Notice is the best notice that is practicable ...................... 33

      2.    The proposed Notice clearly and concisely provides the
required information in plain, easily understood language ...................... 33

IX.   PROPOSED SCHEDULE OF EVENTS AND CONCLUSION ................................... 34

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Allen v. Bedolla,*
    787 F3d 1218 (9th Cir. 2015) ................................................................... 21, 28

*Amchem Prods., Inc. v. Windsor,*
    521 US 591 (1997) ................................................................................... 13, 14

*AmeriPride Servs. Inc. v. Valley Indus. Servs., Inc.,*
    2007 WL 1946635 (E.D. Cal. July 2, 2007) ............................................. 31, 32

*Anderson v. Davis Wright Tremaine LLP,*
    2023 WL 6003862 (D. Or. Sep. 5, 2023) ....................................................... 32

*Azar v. Blount Int'l, Inc.,*
    2019 WL 7372658 (D. Or. Dec. 31, 2019) ..................................................... 24

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F3d 935 (9th Cir. 2011) ..................................................................... 21, 28

*Bowling v. Pfizer, Inc.,*
    143 FRD 141 (S.D. Ohio 1992) ..................................................................... 26

*Brinkmann v. ABM Onsite Servs. - West, Inc.,*
    2021 WL 3932040 (D. Or. Sept. 2, 2021) ................................................. 14, 17

*Briseno v. ConAgra Foods, Inc.,*
    844 F3d 1121 (9th Cir. 2017) ........................................................................ 14

*Campbell v. Facebook, Inc.,*
    951 F3d 1106 (9th Cir. 2020) ........................................................................ 30

*In re Checking Account Overdraft Litig.,*
    830 F Supp 2d 1330 (S.D. Fla. 2011) ............................................................ 25

*City of Grants Pass, Oregon v. Johnson,*
    603 US 520 (2024) ........................................................................................ 10

*Ciuffitelli v. Deloitte & Touche LLP,*
    2019 WL 1441634 (D. Or. Mar. 19, 2019) ..................................................... 32

*In re College Athlete NIL Litig.,*
    No. 4:20-cv-03919 (N.D. Cal.) ................................................................. 19, 30

*Demmings v. KKW Trucking, Inc.*,
   2018 WL 4495461 (D. Or. Sept. 19, 2018) ...................................................................... 33

*Dennis v. Kellogg Co.*,
   697 F3d 858 (9th Cir. 2012) .......................................................................................... 21

*Eisen v. Porsche Cars N. Am., Inc.*,
   2014 WL 439006 (C.D. Cal. Jan. 30, 2014) ................................................................... 30

*In re Extreme Networks, Inc. Sec. Litig.*,
   2019 WL 3290770 (N.D. Cal. July 22, 2019) ................................................................. 29

*Fatnani v. JPMorgan Chase & Co.*,
   2025 WL 1305294 (D. Or. May 6, 2025) ...................................................... 17, 25, 26, 27

*Fluck v. Blevins*,
   969 F Supp 1231 (D. Or. Apr. 18, 1997) ........................................................................ 31

*Franklin v. Kaypro Corp.*,
   884 F2d 1222 (9th Cir. 1989) ......................................................................................... 31

*Granados v. OnPoint Cmty. Credit Union*,
   2025 WL 1640204 (D. Or. June 10, 2025) ............................................................ 11, 12, 13

*Hanlon v. Chrysler Corp.*,
   150 F3d 1011 (9th Cir. 1998) .................................................................................... 13, 21

*Hay v. Or. Dep't of Transp.*,
   301 Or 129 (1986) .......................................................................................................... 16

*Hesse v. Sprint Corp.*,
   598 F3d 581 (9th Cir. 2010) ........................................................................................... 30

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F3d 539 (9th Cir. 2019) ..................................................... 9, 10, 13, 14, 15, 21, 33

*Jimenez v. Allstate Ins. Co.*,
   765 F3d 1161 (9th Cir. 2014) ......................................................................................... 11

*Johnson v. City of Grants Pass*,
   72 F4th 868 (9th Cir. 2023) ........................................................................................... 10

*Kim v. Allison*,
   8 F4th 1170 (9th Cir. 2021) ........................................................................................... 28

*Linney v. Cellular Alaska P'ship*,
  151 F3d 1234 (9th Cir. 1998)...................................................................... 26, 27

*Lytle v. Nutramax Lab'ys, Inc.*,
  114 F4th 1011 (9th Cir. 2024)........................................................................ 14

*In Re Mego Fin. Corp.*,
  213 F3d 454 (9th Cir. 2000).......................................................................... 26

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F4th 651 (9th Cir. 2022)....................................................................... 15, 16

*In re Online DVD-Rental Antitrust Litig.*,
  779 F3d 934 (9th Cir. 2015).......................................................................... 28

*In re Pac. Enters. Sec. Litig.*,
  47 F3d 373 (9th Cir. 1995)............................................................................ 27

*In re Packaged Seafood Prods. Antitrust Litig.*,
  2022 WL 228823 (S.D. Cal. Jan. 26, 2022)...................................................... 25

*Pearson et al. v. Port of Morrow et al.*,
  2024 No. 2:24-cv-00362-HL (D. Or. 2024) ................................................... 5, 13

*Pearson v. Port of Morrow*,
  2025 WL 3691202 (D. Or. Dec. 19, 2025)................................................... 15, 16

*In re Portland Gen. Elec. Sec. Litig.*,
  2022 WL 844077 (D. Or. Mar. 22, 2022)..................................................... 17, 24

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
  2019 WL 3410382 (D. Or. July 29, 2019) ................................................ 9, 16, 21, 26, 27

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F3d 741 (9th Cir. 2006)........................................................................... 30

*Rodriguez v. West Publ'g Corp.*,
  563 F3d 948 (9th Cir. 2009)........................................................................... 21

*Ruiz Torres v. Mercer Canyons Inc.*,
  835 F3d 1125 (9th Cir. 2016)......................................................................... 15

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
  2023 WL 3749996 (S.D.N.Y. June 1, 2023) ................................................... 25

*Standard Iron Works v. Arcelormittal*,
   2014 WL 11350176 (N.D. Ill. Oct. 23, 2014)..................................................... 25

*Staton v. Boeing Co.*,
   327 F3d 938 (9th Cir. 2003)................................................................................. 21

*Stearns v. Ticketmaster Corp.*,
   655 F3d 1013 (9th Cir. 2011)................................................................................. 9

*Stratton v. Glacier Ins. Admin'rs, Inc.*,
   2007 WL 274423 (E.D. Cal. Jan. 29, 2007)........................................................ 25

*In re Syncor ERISA Litig.*,
   516 F3d 1095 (9th Cir. 2008).............................................................................. 10

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 US 442 (2016)......................................................................................... 14, 15

*In re Urethane*,
   768 F3d 1245 (10th Cir. 2014)............................................................................ 16

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
   725 F App'x 560 (9th Cir. 2018) ......................................................................... 30

*Wal-Mart Stores, Inc. v. Dukes*,
   564 US 338 (2011)................................................................................................11

*Williams v. Boeing Co.*,
   517 F3d 1120 (9th Cir. 2008).............................................................................. 30

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F3d 1168 (9th Cir. 2010)......................................................................... 13, 17

*Woody v. Fred Meyer Stores, Inc.*,
   2025 WL 368806 (D. Or. Feb. 3, 2025) .............................................................. 21

*Zepeda v. PayPal, Inc.*,
   2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) .................................................... 26

## STATUTES

42 U.S.C. § 6901............................................................................................................... 6

Or. Rev. Stat. § 31.815(1) ............................................................................................... 31

Or. Rev. Stat. § 31.815(2) ............................................................................................... 31

## OTHER AUTHORITIES

Fed. R. Civ. P.

Rule 23(a)(1) .................................................................................................... 10

Rule 23(a)(2) .................................................................................................... 14

Rule 23(a)(3) .................................................................................................... 12

Rule 23(b)(3) .................................................................................................... 17

Rule 23(c)(2)(B) ................................................................................................ 33

Rule 23(e) .................................................................................................... 1, 10

Rule 23(e)(2) .................................................................................................... 10

Rule 23(g)(1) .................................................................................................... 18

## I.    LOCAL RULE 7-1(A) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Plaintiffs Michael Pearson, James Suter, Silvia Suter, Rosa Cavasos, Jeffrey Fleming, and Jon Haley ("Plaintiffs") conferred with counsel for Defendant Amazon Data Services, Inc. ("ADS") (together, the "Parties"), and this Motion is filed jointly on behalf of Plaintiffs and ADS pursuant to their Class Settlement and Release Agreement.

## II.    MOTION

The Parties move under Fed. R. Civ. P. 23(e) for an order:

(1) preliminarily approving the Class Action Settlement and Release Agreement between Plaintiffs and ADS ("Agreement");[1]

(2) provisionally certifying a Settlement Class, for settlement purposes only, defined as "all Persons who currently own or rent property or reside in the Lower Umatilla Basin Groundwater Management Area";

(3) provisionally appointing the law firms of Hagens Berman Sobol Shapiro LLP, Heenan & Cook, and Bliven Law Firm, PC, as Settlement Class Counsel;

(4) provisionally appointing Plaintiffs as Settlement Class Representatives;

(5) approving the proposed notice documents and directing the Settlement Administrator to distribute these notice documents to Class members according to the proposed notice schedule;

(6) approving the procedures for individuals in the Settlement Class to opt-out of or object to the Settlement;

(7) granting a stay of all proceedings, including (but not limited to) discovery and responsive pleading deadlines; and

(8) scheduling a Fairness Hearing.

This Motion is supported by the following Memorandum of Law, the Declaration of Steve W. Berman ("Berman Decl."), the Declaration of John Heenan ("Heenan Decl."), the Declaration

---

[1] All terms not explicitly defined herein shall possess the same meaning as defined in the Agreement.

of Michael A. Bliven ("Bliven Decl."), the declaration of Lester J. Levy, Esq. ("Levy Decl."), and the Declaration of Cameron R. Azari, Esq. ("Azari Decl.").

III.    MEMORANDUM OF LAW

**A.    Introduction**

Plaintiffs, individually and on behalf of all others similarly situated, brought this case and the related *Pearson v. Port of Morrow*, Case No. 2:24-CV-00362-SI (D. Or.) action for alleged claims regarding groundwater contamination in eastern Oregon's Lower Umatilla Basin Groundwater Management Area ("LUBGWMA"). In a significant step toward addressing contamination in the LUBGWMA, Plaintiffs and ADS have reached a settlement agreement that will provide $20.5 million for funding projects that provide or improve infrastructure for clean drinking water to LUBGWMA residents. The Parties respectfully move this Court for preliminary approval of the proposed Agreement.

The Settlement provides substantial relief for the Settlement Class, including the payment by ADS of $20.5 million into a non-reversionary Settlement Fund that will be used to fund "Private Well Projects" and "Public Infrastructure Projects" that allow LUBGWMA residents to access clean, affordable water, any Service Awards awarded to Class Representatives, any attorneys' fees and costs awarded to Class Counsel, and Administrative Costs.

Private Well Projects will enable Settlement Class Members meeting certain requirements who rely on contaminated private drinking water wells to extend or alter the wells to reach the "basalt" aquifer in the LUBGWMA. The Settlement Fund will also be available to fund Public Infrastructure Projects that: extend water supply pipelines to households using private wells that are not currently connected to public drinking water systems, enable public utilities to access additional sustainable sources of clean drinking water, treat water to remove or reduce contamination, or maintain or improve the operational effectiveness of public water or public

PAGE 2 - JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

wastewater treatment systems to lower the costs of ensuring clean drinking water in public water systems.

The Settlement is fair, reasonable, and adequate. It provides meaningful relief in the face of complex and expensive litigation that poses a risk that Plaintiffs and the Settlement Class might recover nothing from ADS. The Settlement is the result of well-informed, arm's-length negotiations among counsel with extensive experience in class action litigation, facilitated by an experienced mediator, Lester J. Levy, Esq. The Parties therefore respectfully and jointly request that the Court preliminarily approve the Settlement, provisionally certify the Settlement Class, approve the Notice Plan, direct the Settlement Administrator to issue notice accordingly, and set Settlement-related deadlines.

## IV.    BACKGROUND

### A.    Basis of the Litigation

Plaintiffs' claims against ADS arise out of allegations concerning ADS's operation of data centers in the LUBGWMA in eastern Oregon, which encompasses approximately 562 square miles of land in northern Morrow and Umatilla counties and includes the cities of Boardman, Hermiston, Irrigon, Stanfield, and Echo. The LUBGWMA was declared a Groundwater Management Area by the state of Oregon in 1990 due to nitrate concentrations in groundwater. Compl. ¶ 7. Plaintiffs allege that nitrate is a pollutant that is dangerous to human health. Specifically, Plaintiffs allege in their Complaint that water with nitrate concentrations of more than 10 milligrams per liter (mg/L) is not safe for human consumption, *id.* ¶ 59, that high-nitrate water causes reproductive complications (including preterm birth and birth defects), kidney and spleen disorders, respiratory diseases, and cancer, *id*. ¶ 51, and that it is especially dangerous for infants because nitrate interferes with blood-oxygen levels and can cause infant methemoglobinemia, or "Blue Baby

Syndrome," a potentially fatal condition that turns babies blue or grey as their bodies are starved of oxygen, *id.* ¶ 50.

Plaintiffs further allege that nitrate contamination has injured LUBGWMA residents who rely on public water systems and those who rely on private domestic wells. Plaintiffs allege that users of public water systems pay more for their water than they otherwise would because public water systems recoup the costs of nitrate removal by passing those costs along to consumers. *Id.* ¶¶ 93–95. Plaintiffs also allege that individuals who rely on nitrate-contaminated private wells cannot drink their well water due to nitrate concentrations in the groundwater. *Id.* ¶¶ 13–27, 34–39. The Oregon Health Authority instructs that "***Nitrate levels above 10 mg/L are unsafe to drink or cook with.***" *Id.* ¶ 65. Thus, LUBGWMA residents whose wells have nitrate concentrations of more than 10 mg/L are allegedly forced to use bottled water for cooking and drinking, which is cumbersome and inconvenient. *Id.* ¶¶ 13–27, 34–39. Plaintiffs further assert that many private domestic wells in the LUBGWMA have not yet been tested, and that there are likely hundreds or thousands of LUBGWMA residents who are unknowingly drinking nitrate-contaminated water. *See id.* ¶ 65.

Plaintiffs allege that wastewater from ADS's data center operations contributes to nitrate contamination in the LUBGWMA. *Id.* ¶¶ 1–12, 74–77. They also allege that ADS began operating data centers in the LUBGWMA in 2011, and has at least thirteen data centers operating in the LUBGWMA as of this filing. Plaintiffs claim that those data centers' cooling operations generate tens of millions of gallons of high-nitrate wastewater every year. Plaintiffs assert that ADS disposes of its wastewater by discharging it into open canals that run through the LUBGWMA, or by conveying it to the Port of Morrow, which dumps the wastewater on five farms in the LUBGWMA. *Id.* ¶ 74. The Port has a state-issued wastewater discharge permit that is intended to

protect groundwater from contamination. *Id.* ¶ 4, 71. But, according to Plaintiffs' allegations, the Port has violated its permit more than 2,000 times since 2015, routinely discharging excess nitrogen, failing to monitor the fields where it is dumping, and failing to report serious wastewater leaks. *Id.* Plaintiffs allege that these violations result in excess nitrate in the soil and contaminate the groundwater of the LUBGWMA. *Id.* ¶¶ 74–75.  The state has taken enforcement action against the Port in response to alleged permit violations.

ADS denies Plaintiffs' allegations against it and disputes Plaintiffs' characterizations of its operations and any alleged contribution to contamination in the LUBGWMA. ADS's operations in the LUBGWMA use non-contact cooling water ("NCCW") during warmer months. While cooling water supplied to ADS's data centers in the LUBGWMA may contain nitrogen or nitrates due to the water source, ADS asserts that it does not add materials with nitrogen or nitrates to the NCCW when used in the data centers. When the NCCW leaves the data centers, it is conveyed to third parties for beneficial reuse as irrigation water where possible. ADS also contends that any nitrogen or nitrates in the NCCW are negligible. The LUBGWMA was designated well before ADS began operations in the region.

**B.      Negotiation of the Proposed Settlement**

Plaintiffs' counsel began investigating nitrate contamination in the LUBGWMA in 2022. In 2024, Plaintiffs Michael Pearson and James and Silvia Suter filed suit against five entities that were causing nitrate contamination, including the Port of Morrow. *See Pearson et al. v. Port of Morrow et al.*, No. 2:24-cv-00362-HL (D. Or. Feb. 28, 2024). The Defendants moved to dismiss Plaintiffs' complaint and the motions were argued before Magistrate Judge Hallman on October 30, 2024. On February 24, 2025, Judge Hallman issued Findings & Recommendations which largely recommended denying Defendants' motions to dismiss. On December 19, 2025, Judge

Simon issued an order holding that Plaintiffs had stated viable claims against four defendants, including the Port of Morrow.

Meanwhile, Plaintiffs' counsel continued investigating potential causes of nitrate contamination in the LUBGWMA. *See* Berman Decl. ¶ 14. They reviewed thousands of pages of documents and learned that ADS's data centers were conveying NCCW to the Port of Morrow and to canals used for irrigation and that the water sent by ADS to the Port was believed to contain nitrates. *Id*. On March 7, 2024, Plaintiffs' counsel sent ADS a notice of intent to sue under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.*

After ADS received the pre-suit RCRA notice, Plaintiffs and ADS agreed to mediate the potential claims against ADS with Lester J. Levy, Esq., an experienced mediator in complex environmental cases. Berman Decl. ¶ 15; Levy Decl. ¶ 4. Prior to and during the mediation, the Parties exchanged mediation statements and engaged in informal discovery, exchanging information regarding the location of ADS's LUBGWMA data centers and management of the discharged NCCW. Berman Decl. ¶ 14; Levy Decl. ¶ 5. Plaintiffs' counsel were therefore well informed regarding the facts of the case and the strengths and weaknesses of Plaintiffs' claims and ADS's defenses during the mediation. Berman Decl. ¶ 14; Levy Decl. ¶ 6.

On October 9, 2025, the Parties engaged in a full-day mediation with Mr. Levy. *See* Berman Decl. ¶ 15; Levy Decl. ¶ 5. While the Parties made strides toward reaching an agreement, they did not reach a resolution. After the first day of mediation, the Parties continued their arm's-length negotiations and exchanged additional information. Berman Decl. ¶ 15; Levy Decl. ¶ 8. On December 2, 2025, the Parties engaged in a second full-day mediation with Mr. Levy. Berman Decl. ¶ 16; Levy Decl. ¶ 9. The parties exchanged further communications, and made additional progress, exchanging a series of offers and counter-offers, but did not reach a resolution. Berman

PAGE 6 - JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

Decl. ¶ 16; Levy Decl. ¶ 9. The Parties subsequently continued their negotiations for several weeks and, after further offers and counter-offers regarding the terms of an agreement, facilitated through experienced mediator Mr. Levy, reached an agreement in principle. Berman Decl. ¶ 16; Levy Decl. ¶ 10. The Parties thereafter engaged in a series of further discussions over multiple months, during which the Parties negotiated, drafted, and finalized the terms of the Agreement. Berman Decl. ¶ 16; Levy Decl. ¶ 10. The Agreement was fully executed by the Parties as of March 28, 2026.

## C.    Summary of the Settlement Agreement

### 1.    Class definition

The Settlement Class is defined as all Persons who currently own or rent property or reside in the Lower Umatilla Basin Groundwater Management Area. Agreement ¶ II.A. Excluded from the Settlement Class are: (1) ADS; (2) any entity in which ADS has a controlling interest; (3) any Person with a controlling interest in ADS; (4) any current or former officer or director of ADS; (5) the legal representatives, successors, or assigns of ADS; (6) the Court, the Court's immediate family, and Court staff; and (7) all attorneys and employees of Class Counsel. Agreement ¶ II.B.

### 2.    Monetary terms and benefits to the Settlement Class

The Agreement requires ADS to pay $20.5 million into a Settlement Fund that will fund private and/or public infrastructure projects that will improve access to safe drinking water throughout the LUBGWMA. The Settlement Fund will be used to disburse funds to private-well-reliant households to extend their wells to reach the LUBGWMA's deeper "basalt" aquifer ("Private Well Projects") and to fund "Public Infrastructure Projects." The Public Infrastructure Projects will include projects such as connecting private-well-reliant households to public water systems, enabling utilities to access additional sustainable sources of clean drinking water, treating wastewater to remove or reduce contamination, or maintaining or improving the operational effectiveness of public drinking water or public wastewater treatment systems to lower the costs

of providing clean drinking water in public water systems. Agreement ¶ IV.A(2)(a). The Public Infrastructure Projects will provide relief to the Settlement Class Members that is consistent with Plaintiffs' claims seeking access to clean drinking water. The specific details regarding the allocation and claims process for the Settlement Fund will follow in a subsequent allocation plan and claim form, which will be subject to approval by the Court upon notice to the Settlement Class.

To the extent the Settlement Fund is not exhausted by the payment of funds toward Private Well Projects or Public Infrastructure Projects and any funds remain five years after the Effective Date of the Agreement, any remaining funds shall be paid to municipalities within the LUBGWMA proportionally based upon relative population size as of the last census for purposes of providing clean and sustainable water supplies, subject to Court approval. Agreement ¶ IV.A(5). The Settlement Fund will operate as a qualified settlement fund within the meaning of United States Treasury Regulation § 1.468B-1.

### 3.    Proposed Notice Plan

The Settlement proposes a Notice Plan requiring direct notice via mail as well as publication notice. The Settlement Administrator, Epiq Class Actions & Claims Solutions, Inc. ("Epiq"), will be responsible for issuing notice according to the Agreement's terms. Azari Decl. ¶ 5.

The Notice Plan requires the Settlement Administrator to send a short-form notice via postcard to all Settlement Class members for whom mailing addresses are reasonably available. The postcard notice will include information on: (1) the allegations asserted in the Action; (2) the Settlement's benefits; (3) how persons in the Settlement Class can exclude themselves from the Settlement or how Settlement Class Members can object to the Settlement; (4) how to access the Settlement Website; (5) information detailing the Response Deadline for any Requests for Exclusions and Objection Deadline; and (6) contact information that will allow Settlement Class

Members to learn more about the Settlement, submitting an objection, or opting out. The postcard notice will also direct Settlement Class members to the Settlement Website, where the long-form Notice and relevant case documents will be available. *See* Azari Decl. ¶¶ 9–12 & Attachment 1.

### 4. Release of liability

Upon the Effective Date of the Settlement, the Released Parties shall be released from any and all claims as set forth in the Agreement. Plaintiffs and Settlement Class Members shall extinguish all liability of the Released Parties for contribution or indemnity to any other Person as set forth in the Agreement. The Agreement does not release personal injury claims against ADS arising from nitrogen or nitrates in the groundwater. These releases are as described in the proposed long-form notice and Agreement. Notice at 4, 6, 8; Agreement ¶ X.  The Parties request that the Court issue a Bar Order as set forth in the Agreement and below.

## V. STANDARDS FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

### A. Preliminary approval versus final approval

This Court reviews proposed class action settlements with the same standards at the preliminary approval stage as it does when it considers the settlement's final approval. *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2019 WL 3410382, at *1 (D. Or. July 29, 2019) (Simon, J.).

### B. Certification of settlement class

To certify a settlement class, the requirements of Rule 23 must be satisfied. *Id.* Rule 23 affords the Court "broad discretion over certification of class actions." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011). A plaintiff must satisfy all four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—plus at least one subsection of Rule 23(b). *In re Premera*, 2019 WL 3410382, at *2. "The criteria for class certification are applied differently in litigation classes and settlement classes." *In re Hyundai &*

*Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc). In considering a litigation class, the court "must be concerned with manageability at trial," but in considering a settlement class, "such manageability is not a concern . . . [because], by definition, there will be no trial." *Id.* at 556–57. "On the other hand, in deciding whether to certify a settlement class, a district court must give heightened attention to the definition of the class or subclasses." *Id.* at 557.

## C.    When a proposed settlement is fair, reasonable, and adequate

Under Rule 23(e) of the Federal Rules of Civil Procedure, the "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The purpose of Rule 23(e) "is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Thus, to approve a class action settlement, a court must find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

## VI.    THE SETTLEMENT CLASS SHOULD BE PRELIMINARILY CERTIFIED

The proposed Class should be preliminarily certified under Rule 23(b)(3).

## A.    The Settlement Class satisfies Rule 23(a)

### 1.    The Settlement Class is sufficiently numerous

The proposed Settlement Class is sufficiently numerous. To satisfy the numerosity requirement a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[P]roposed classes of less than fifteen are too small while classes of more than sixty are sufficiently large." *Johnson v. City of Grants Pass*, 72 F.4th 868, 886 (9th Cir. 2023), *rev'd on other grounds*, *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520 (2024). "In general, classes of 20 members or fewer are too small, classes of 21 to 40 members may or may not be sufficiently numerous depending on the facts of the case, and classes of 41 and higher are

sufficiently numerous." *Granados v. OnPoint Cmty. Credit Union*, 2025 WL 1640204, at *3 (D. Or. June 10, 2025) (Simon, J.) (finding that class of 328 met numerosity requirement).

Here, the Settlement Class contains thousands of members. Compl. ¶ 1, 102. It is much larger than other classes that this Court has found sufficiently numerous. *See Granados*, 2025 WL 1640204, at *3.

### 2.    Questions of law and fact are common to the Settlement Class

Rule 23(a)(2) states that class certification is appropriate only when the case presents "questions of law or fact common to the class." To satisfy the commonality requirement, the plaintiff must show that the class members suffered the "same injury" and that their claims depend upon a "common contention." *Granados*, 2025 WL 1640204, at *3 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The "common contention, . . . must be of such a nature that it is capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted). "But class members need not have every issue in common. Commonality requires only 'a single significant question of law or fact' in common." *Granados*, 2025 WL 1640204, at *3 (citation omitted). "These common questions may center on 'shared legal issues with divergent factual predicates [or] a common core of salient facts coupled with disparate legal remedies.'" *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (citation omitted).

Here, Plaintiffs assert that their and the Settlement Class Members' claims against ADS depend on a common core of facts and common legal theories of ADS's potential liability. Plaintiffs assert that the common issues include:

(a) Whether ADS's operations have caused nitrate to contaminate the groundwater in the LUBGWMA;

(b) Whether the measures ADS has implemented to prevent nitrates from contaminating the groundwater in the LUBGWMA are effective and sufficient;

(c) Whether ADS has contributed to the past or is contributing to the present handling, storage, treatment, transportation, or disposal of solid or hazardous waste in violation of the Resource Conservation and Recovery Act;

(d) Whether ADS acted negligently by allowing nitrates to contaminate the groundwater in the LUBGWMA;

(e) Whether ADS trespassed on Plaintiffs' and other Settlement Class Members' property;

(f) Whether ADS created a nuisance by unreasonably interfering with Plaintiffs' and Settlement Class Members' use and enjoyment of their properties;

(g) Whether Plaintiffs and Settlement Class Members are entitled to equitable relief; and

(h) Whether ADS's allegedly unlawful conduct damages Plaintiffs and the Settlement Class Members.

The answers to these questions are central to this litigation and will be the same no matter who in the Settlement Class asks them.

### 3.    The Class Representatives' claims are typical of the Settlement Class

The claims of the Class Representatives are typical of the claims of the Settlement Class, as required by Fed. R. Civ. P. 23(a)(3). "Under the 'permissive standards' of Rule 23(a)(3), 'representative claims are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Granados*, 2025 WL 1640204, at *4 (quoting

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). To determine whether claims and defenses are typical, courts look to "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as the Settlement Class's, and Plaintiffs have allegedly suffered similar damages as the Settlement Class. *Granados*, 2025 WL 1640204, at *4. Thus, the typicality requirement is satisfied.

### 4.      Representation of the Settlement Class is adequate

Rule 23(a)(4) states that to certify a class, the court must find that "the representative parties will fairly and adequately protect the interests of the class." This requirement "'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" *In re Hyundai*, 926 F.3d at 566 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n.20 (1997)). To assess adequacy of representation, the Court considers "two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *In re Hyundai*, 926 F.3d at 566 (quoting *Hanlon*, 150 F.3d at 1020). Plaintiffs and Class Counsel represent that there are no conflicts of interest between Plaintiffs or Class Counsel and the Settlement Class, and Plaintiffs allege the same or similar harms as the absent Settlement Class Members. Further, Plaintiffs and Class Counsel have vigorously prosecuted the related *Port of Morrow* litigation. *See* Order, Dkt. No. 98, *Pearson et al. v. Port of Morrow et al.*, No. 2:24-cv-00362-HL (D. Or. Feb. 28, 2024).  Therefore, Plaintiffs and Class Counsel demonstrate that they are adequate and that no conflicts exist.

### 5.      Settlement Class Members are ascertainable

The Settlement Class satisfies any ascertainability requirement. Courts in the Ninth Circuit have considered ascertainability in assessing class certification, but the Ninth Circuit has clarified that ascertainability "is not a freestanding requirement for class certification." *Brinkmann v. ABM Onsite Servs. - West, Inc.*, 2021 WL 3932040, at \*9 (D. Or. Sept. 2, 2021) (Simon, J.) (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125–28, n.3–4 (9th Cir. 2017)). In any case, identifying and contacting Settlement Class members in this matter is straightforward because they are all residents of the LUBGWMA.

## B.      The Rule 23(b)(3) requirements are satisfied

The Settlement Class should be certified under Rule 23(b)(3), "which requires that 'questions of law or fact common to class members' must 'predominate over any questions affecting only individual members,' and the class action must be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *In re Hyundai*, 926 F.3d at 556.

### 1.      Common issues predominate

"The predominance inquiry under Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* at 557 (quoting *Amchem*, 521 U.S. at 623). The predominance inquiry "presupposes satisfaction of the commonality requirement of Fed. R. Civ. P. 23(a)(2), which itself tests 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (citation omitted). The "predominance inquiry goes further and 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

"Predominance is not . . . a matter of nose-counting." *In re Hyundai*, 926 F.3d at 557 (quoting *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)). Instead, the Court should more heavily weigh "important questions apt to drive the resolution of the litigation . . . over individualized questions which are of considerably less significance to the claims of the class." *Id.* (quoting *Ruiz Torres*, 835 F.3d at 1134).

> When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."

*Tyson Foods, Inc.*, 577 U.S. at 453. A "district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial, a conclusion implicitly based on the determination that such individualized issues do not predominate over common ones." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022).

Common issues predominate over individual issues that the Settlement Class Members might have. Plaintiffs and the Settlement Class Members claim to have been injured by a common course of conduct undertaken by ADS that resulted in substantially similar injuries to Plaintiffs and the Settlement Class Members.

Plaintiffs assert that common evidence will establish whether ADS is liable to Plaintiffs and Settlement Class Members under RCRA, including whether ADS has contributed to the handling, treatment, transportation, or disposal of solid waste under RCRA, whether those nitrates constitute "solid waste" under RCRA, and whether nitrates may present an imminent and substantial endangerment to health or the environment in the LUBGWMA. *Pearson v. Port of Morrow*, 2025 WL 3691202, at *11 (D. Or. Dec. 19, 2025).

Plaintiffs further assert that common issues will predominate as to Plaintiffs' negligence claim because whether ADS "caused a foreseeable and unreasonable risk of harm to Plaintiffs'

legally protected property interest in nitrate-free water," *Port of Morrow*, 2025 WL 3691202, at *19, and whether ADS's conduct is unreasonable in light of the risk, is common to all Settlement Class Members.  Plaintiffs similarly contend that common issues will predominate as to their trespass claim since whether ADS "intentionally trespassed on [Settlement Class Members'] property by continuing to cause nitrate pollution in the groundwater," *Port of Morrow*, 2025 WL 3691202, at *20, will be resolved with common evidence as to the extent of the alleged contamination.  Finally, Plaintiffs claim that their private nuisance claim will depend on common evidence as to whether ADS's conduct is unreasonable and the severity of the nuisance allegedly caused by ADS in the LUBGWMA.  *See Hay v. Or. Dep't of Transp.*, 301 Or. 129, 135 (1986) ("[P]laintiff claiming private nuisance must show that the defendant unreasonably and substantially interfered with the use and enjoyment of his property . . . .").

If Plaintiffs fail to prove widespread contamination of the LUBGWMA by ADS with common evidence, then they will lose on the merits, but that is no reason to deny class certification. A "district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67 (9th Cir. 2022). Further, "'[t]he presence of individualized damages issues' does not preclude a court from certifying a class because '[c]lass-wide proof is not required for all issues.'" *Id*. at 669 (quoting *In re Urethane*, 768 F.3d 1245, 1255 (10th Cir. 2014)).

### 2.    A class action is superior

The Settlement Class satisfies the Rule 23(b)(3) requirement that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) "provides four non-exhaustive factors to consider" in deciding whether a class action is superior. *In re Premera*, 2019 WL 3410382, at *20. These factors are:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The fourth factor does not apply to certification of a settlement class. *Fatnani v. JPMorgan Chase & Co.*, 2025 WL 1305294, at *6 (D. Or. May 6, 2025) ("The Court need not consider the fourth factor because the parties only seek certification of a settlement class, not a litigation class."). A class action is superior with respect to the three remaining factors.

The first factor favors class certification because no Settlement Class Member has the means to litigate an individual action against ADS. *In re Portland Gen. Elec. Sec. Litig.*, 2022 WL 844077, at *5 (D. Or. Mar. 22, 2022) (Simon, J.) ("As to the first factor, '[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.'" (quoting *Wolin*, 617 F.3d at 1175).

The second factor favors certification because no similar litigation has been commenced concerning nitrate contamination of the LUBGWMA other than the *Port of Morrow* action, and the Parties are moving to consolidate the actions.

The third factor favors certification because this case involves alleged conduct by ADS that occurred only in Oregon, and all Settlement Class Members were allegedly harmed in Oregon. *See Brinkmann*, 2021 WL 3932040, at *9 ("concentrating this litigation in the District of Oregon is appropriate, as the Class itself is exclusive to workers in Oregon, ABM does business in Oregon, and the District Court is well situated to hear both the federal FLSA claims and the state . . . claims.").

**C.      All Plaintiffs should be appointed as Class Representatives**

Plaintiffs Michael Pearson, James Suter, Silvia Suter, Rosa Cavasos, Jeffrey Fleming, and Jon Haley should be appointed as Class Representatives because they share an interest with absent Settlement Class Members and do not have claims adverse to absent Settlement Class Members or that would benefit Class Representatives to the detriment of absent Settlement Class Members. *See* Berman Decl., at ¶ 17. Moreover, Plaintiffs have helped Plaintiffs' counsel vigorously prosecute this action and the *Port of Morrow* action. *Id.*

**D.      The law firms of Hagens Berman Sobol Shapiro LLP, Heenan & Cook, and Bliven Law Firm, PC should be appointed as Settlement Class Counsel**

"Unless a statute provides otherwise, a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). Under Rule 23(g)(1)(A), the Court "must consider" (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.

Plaintiffs request that the Court appoint the firms of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), Heenan & Cook, and Bliven Law Firm, PC, as Settlement Class Counsel.[2]

**1.      Counsel's work identifying and investigating potential claims**

Counsel for the proposed Settlement Class have been investigating nitrate contamination in the LUBGWMA for more than three years. In 2022, Class Counsel began gathering information regarding nitrate contamination in the area by talking to local residents, reading news reports, making public records requests, and analyzing publicly-available information regarding nitrate

---

[2] ADS takes no position on the request for appointment of Class Counsel, but stipulates to the request as set forth in the Agreement.

contamination. Bliven Decl. ¶ 7. Counsel began serving Oregon Tort Claims Act and RCRA notices against entities they believed to be responsible for nitrate contamination in December 2022, and they filed suit against five of those entities in 2024. *Id.* ¶ 8. Throughout this period, Counsel continued gathering information regarding entities that could be contributing to nitrate pollution in the LUBGWMA and, as Plaintiffs have alleged, learned that ADS was operating data centers that generated NCCW, and that much of that NCCW is conveyed to open irrigation canals and to the Port of Morrow for land application in the LUBGWMA. Berman Decl. ¶ 14. Counsel for Plaintiffs allege this NCCW contains nitrates and used this to inform their allegations of ADS's contribution to nitrate contamination in the LUBGWMA and research Plaintiffs' and Settlement Class members' potential claims against ADS. *Id.*

### 2. Counsel's experience in handling complex litigation

#### a. Hagens Berman

Hagens Berman and Steve Berman have been appointed lead or co-lead counsel in many of the largest and most impactful consumer fraud, product liability, securities, and antitrust cases in history. Recently, Mr. Berman served as court-appointed co-lead counsel in *In re College Athlete NIL Litig.*, No. 4:20-cv-03919 (N.D. Cal.), representing a class of nearly 400,000 college athletes. In June 2025, Hagens Berman and one other firm obtained final approval of a historic settlement with the NCAA providing $2.78 billion in damages as well as payments and benefits to college athletes valued at more than $20 billion over the next 10 years, making it the largest antitrust class-action settlement in history.  The Hagens Berman firm resume is attached to Mr. Berman's Declaration as Exhibit A.

#### b. Heenan & Cook

John Heenan, a founding member of Heenan & Cook, focuses on representing consumers, including in class actions. He is a board member of the National Association of Consumer

Advocates, a national consumer attorney organization involved in consumer class action litigation. He has successfully tried numerous cases to verdict, including a $2,000,000 mortgage servicer verdict and, recently, a $27,750,000 civil rights case before this Court. Heenan Decl. ¶ 5. He has been appointed Lead or Co-Lead counsel in numerous class actions in both state and federal court. *Id.* ¶ 6.

### c.     Bliven Law Firm

Mike Bliven is a founding member of Bliven Law Firm, P.C., which has offices in Kalispell, Montana, and Boardman, Oregon. Bliven Decl. ¶ 5. He has represented injured parties and consumers since 1994. *Id.* ¶ 4. He has represented individuals and government entities in class action and mass tort lawsuits in Oregon and Montana and is a member of the American Association for Justice and the Montana Trial Lawyers Association. *Id.* ¶ 6.

### 3.     Knowledge of applicable law

The applicants have a deep knowledge of class action litigation and of the subject matter and issues in this case. They are all experienced litigators who have expertise in managing class action cases and have demonstrated their knowledge of the applicable law in opposing the motions to dismiss in the *Port of Morrow* litigation.

### 4.     Resources committed

The undersigned have committed and will commit all necessary time and financial resources to prosecute this matter zealously. Each firm has the time and financial ability necessary to see this case through. The undersigned have already spent considerable time and effort in litigating this action (and the related *Port of Morrow* action) and are committed to continuing to do so.

## VII.    THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED

The Ninth Circuit applies a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Hyundai*, 926 F.3d at 556 (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015)). "But where, as here, class counsel negotiates a settlement agreement before the class is even certified, courts 'must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011)). "When the parties settle before class certification, the Ninth Circuit requires 'a more probing inquiry than may normally be required under Rule 23(e).'" *Woody v. Fred Meyer Stores, Inc.*, 2025 WL 368806, at *2 (D. Or. Feb. 3, 2025) (quoting *Hanlon*, 150 F.3d at 1026). "The Ninth Circuit has recognized, however, that '[j]udicial review also takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk.'" *In re Premera*, 2019 WL 3410382, at *3 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)).

This Court has explained that the following factors guide a court's review of a class settlement: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Id*. "Courts within the Ninth Circuit 'put a good deal of stock in the product of an arms-length [sic], non-collusive, negotiated resolution.'" *Id.* (quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

2009)). Consistent with these factors and others discussed below, the Court should preliminarily approve the Agreement.

A.    **Strength of Plaintiffs' case and the risk, expense, complexity, and likely duration of further litigation and maintaining class action status through trial**

This is complex environmental litigation. There are currently six defendants in the *Pearson v. Port of Morrow* case, and they have indicated that they believe the case will face significant hurdles at every stage of the litigation, including at class certification and on the merits. Those defendants have argued that Plaintiffs will not prevail on their RCRA claim for multiple reasons, and that Plaintiffs will not prevail on their state-law claims because they will be unable to establish causation given the complex nature of the nitrate contamination problem in the LUBGWMA. *See generally Pearson v. Port of Morrow*, Dkt. Nos. 54, 56, 69.

If this action were litigated, ADS would vigorously contest Plaintiffs' claims. ADS would assert a multitude of defenses to the factual merits of Plaintiffs' case (including but not limited to, defenses that the water ADS uses for cooling already contains nitrates, ADS does not add nitrates to its NCCW, and the NCCW used by ADS contains de minimis nitrates, and the NCCW is used for irrigation purposes), raise a host of legal defenses against Plaintiffs' claim under RCRA and state law tort claims, and challenge class certification both on manageability grounds (which are not at issue in certification of a settlement class), and on the ground that common issues do not predominate, among others. Consistent with ADS's view that it has numerous strong defenses to the Plaintiffs' factual and legal claims, the Agreement states that it "shall not be deemed or construed in any fashion whatsoever to be an admission or evidence of any violation of any statute or law, or of any liability or wrongdoing by ADS or its corporate affiliates, or of the truth or the validity of any claims, facts, defenses, or allegations that have been or might in the future be

asserted in any litigation by Plaintiffs, Settlement Class Members, or any other party." Agreement ¶ XII.C.

While Plaintiffs dispute the merits of ADS's defenses, they acknowledge that this is a complex case and there is risk at every stage of litigation.

Litigating against ADS would also be expensive. Although Plaintiffs are already pursuing litigation against other defendants, each additional defendant adds expense and complexity. ADS will be able to make arguments that are unique as to other defendants, including that it is a relatively recent entrant to the LUBGWMA, given that it did not begin operating data centers in the region until 2011, and that any contribution it may have made to the groundwater issues in the LUBGWMA is negligible compared to that of other defendants. Given the uncertainty of the outcome and the complexity of the case, these factors favor approval of the Settlement.

Finally, the Settlement allows Plaintiffs to obtain certain relief for themselves and the Settlement Class now, rather than after protracted litigation. Although the Court set a brisk schedule in the *Pearson* action, Dkt. No. 153, trial is still over a year away, and any verdict for Plaintiffs and the class would be appealed.

## B.     The amount offered in settlement is reasonable and adequate

The amount of settlement favors preliminary approval. In their Complaint against ADS, Plaintiffs seek damages and injunctive relief that would ensure that all residents of the LUBGWMA have access to clean water. The Agreement provides $20.5 million that will be used for exactly that purpose. This is a significant amount of money, and it will provide meaningful relief to LUBGWMA residents. The funds will be used by people with impacted private domestic wells to dig deeper wells to obtain clean water.  They may also be used to make new connections to public water systems. And people who are already connected to public water systems will

benefit from projects that facilitate public water systems' efforts to deliver clean, affordable water to LUBGWMA households.

The settlement amount of $20.5 million represents a significant percentage of the $35,360,000 – $195,000,000 in damages that Plaintiffs estimate that the Settlement Class could recover if they litigated their claims. Plaintiffs estimate that damages for people in the Settlement Class who rely on private wells (as measured by the cost of drilling deeper wells) are between $25.36 million and $180 million. At a projected $40,000 per well, Plaintiffs allege it would cost approximately $25.36 million to drill deeper wells for the 634 residential wells that have nitrate concentrations of 10 mg/L or more, and $180 million to drill deeper wells for all 4,500 private wells in the LUBGWMA. *See* Compl. ¶¶ 65, 98.[3] Plaintiffs estimate that damages for Persons in the Settlement Class who rely on public water systems are approximately $10–15 million, given the cost to install and operate nitrate treatment equipment. *See id.* ¶ 94. Thus, the settlement amount of $20.5 million represents a recovery of 10.5 percent to as much as 58 percent of the damages Settlement Class members could potentially recover.

Even standing alone, without settlements from any of the other defendants against whom Plaintiffs assert claims, $20.5 million would be reasonable. *See, e.g.*, *In re Portland Gen. Elec.*, 2022 WL 844077, at *7 ("The Settlement amount therefore provides a recovery of 13.2 percent to 14.6 percent of the total estimated damages. This factor favors approval."); *Azar v. Blount Int'l, Inc.*, 2019 WL 7372658, at *7 (D. Or. Dec. 31, 2019) (Simon, J.) (granting final approval to securities case settlement where the settlement amount was "4.63 to 7.65 percent of the Class's

---

[3] Plaintiffs contend that the cost of drilling deeper wells (or connecting households to public water systems) for all private-well-reliant households in the LUBGWMA—even those that have not yet tested above the 10 mg/L maximum contaminant level for nitrates—is an appropriate measure of damages because nitrate concentrations in the LUBGWMA are increasing over time. *See* Compl. ¶¶ 64, 66. A well that tests below the 10 mg/L threshold one year might exceed that threshold the next year.

total damages as Plaintiffs estimated" and quoting another case as stating that "'standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims'") (quoting *In re Checking Account Overdraft Litig.*, 830 F.Supp.2d 1330, 1346 (S.D. Fla. 2011)).

Moreover, the proposed Settlement is particularly reasonable given that numerous other defendants (all of whom have generated or handled wastewater in the LUBGWMA for longer than ADS and contribute new nitrates to the basin) remain in the *Pearson v. Port of Morrow* litigation. Courts frequently stress the importance of a first settlement acting as an icebreaker for other settlements. *See, e.g.*, *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 2023 WL 3749996, at *5 (S.D.N.Y. June 1, 2023) (finding that settlement "provides adequate recovery for the Class, not only through its monetary value, but also through . . . the value of serving as an 'ice-breaker' settlement to potentially facilitate future settlements").[4]

Finally, this Court has recognized that the possibility of future settlements is relevant in assessing the reasonableness of a settlement. In *Fatnani*, this Court approved a settlement of $90,000, where "Plaintiffs estimate that investors hold approximately $65 million in allowed claims, meaning that the Settlement amount provides a recovery of only 0.1 percent." 2025 WL 1305294, at *8. This Court explained that "[i]t is important to note, however, that the Settlement amount is only against two of the remaining five Defendants, and Plaintiffs continue to pursue larger recoveries on their claims against the three non-settling Defendants." *Id.* The Court also noted a "CFTC action currently has more than $26 million in the Qualified Settlement Fund." *Id.*

---

[4] *See also In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 228823, at *5 (S.D. Cal. Jan. 26, 2022); *Standard Iron Works v. Arcelormittal*, 2014 WL 11350176, at *3 (N.D. Ill. Oct. 23, 2014); *Stratton v. Glacier Ins. Admin'rs, Inc.*, 2007 WL 274423, at *5 (E.D. Cal. Jan. 29, 2007).

Here, the Settlement is far more than 0.1 percent and leaves open the possibility of other large settlements.

**C.    The extent of discovery completed and the stage of the proceedings**

"This factor is concerned with whether 'the parties have sufficient information to make an informed decision about settlement.'" *In re Premera*, 2019 WL 3410382, at \*24 (quoting *In Re Mego Fin. Corp.*, 213 F.3d 454, 459 (9th Cir. 2000)). As explained in *Fatnani*, "[f]ormal discovery is not required before a class action settlement." (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239–40 (9th Cir. 1998))." 2025 WL 1305294, at \*8. This Court has found that this factor favors settlement approval where parties "settled before formal discovery, [but] they nevertheless established a substantial evidentiary record and exchanged sufficient information to adequately determine the strengths and weaknesses of their positions." *Id.* "[I]nformally exchanged information and documents in connection with . . . mediations" may be sufficient in lieu of formal discovery. *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at \*14 (N.D. Cal. Mar. 24, 2017); *see also Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 161–62 (S.D. Ohio 1992) (finding that "access to public information available about the Defendants' alleged misconduct" may be sufficient for informed class action settlement negotiations).

This factor supports approval of the Settlement. Before sending a RCRA notice to ADS, Counsel for the proposed Class reviewed thousands of pages of documents regarding nitrate contamination in the LUBGWMA. Berman Decl. ¶ 14. During this review, Class Counsel learned that ADS's data centers were conveying NCCW to the Port of Morrow. *Id.* Class counsel used this information to analyze ADS's operations in the LUBGWMA and identify potential claims against ADS. *Id.* They also obtained discovery from defendants in the related *Pearson* action. *Id.* After ADS received Plaintiffs' RCRA notice, the Parties engaged in formal mediation, which included an exchange of information. Berman Decl. ¶ 15; Levy Decl. ¶ 5. Plaintiffs requested, and ADS

provided, information regarding the location of its data centers and how the data centers' wastewater is managed. Berman Decl. ¶ 14. Plaintiffs' pre-mediation information gathering and the Parties' exchange of information during mediation provided Plaintiffs with "sufficient information to make an informed decision about settlement" and weighs in favor of approval. *See Linney*, 151 F.3d at 1239 (affirming approval of a class settlement where class counsel had not engaged in formal discovery).

The experience and views of Class Counsel also favor approval. As this Court stated in *Fatnani*, "'Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.'" 2025 WL 1305294, at *8 (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)); *see also id.* ("Class Counsel has extensive experience litigating class actions. Thus, Class Counsel's recommendation that the Settlements are fair, reasonable, and adequate favors approval.").

Similarly here, Class Counsel has extensive experience negotiating major class action settlements, and believe that this Agreement is fair, reasonable, and adequate because it provides substantial monetary benefits to the Settlement Class while avoiding the risks, costs, and delay of continuing protracted litigation against ADS. Berman Decl. ¶¶ 5–7, 10. *See also In re Premera*, 2019 WL 3410382, at *24 (noting representation by experienced counsel supports approval).

## D.    The reaction of the class

This factor does not apply. *See In re Premera*, 2019 WL 3410382, at *24 ("Because there has not yet been notice or a response to the Settlement, this factor is not applicable at this stage of the Court's review.").

## E.    The absence of collusion or other conflicts of interest

There are three "signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations" for a pre-certification class settlement.

PAGE 27 - JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

*Bluetooth*, 654 F.3d at 947. Those three signs are: "(1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a clear sailing arrangement (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed [funds] to the defendant." *Allen*, 787 F.3d at 1224 (simplified). "The presence of these three signs is not a death knell—but when they exist, they require the district court to examine them, develop the record to support its final approval decision, and thereby assure itself that the fees awarded in the agreement were not unreasonably high." *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (simplified). The Settlement contains none of these signs. *See* Levy Decl. ¶¶ 12–13.

Here, the Agreement does not include a "clear sailing" provision or a "kicker" clause. Rather, the Agreement states that "[i]n the event any Settlement Funds remain after five (5) years of the Effective Date, such remaining funds shall be paid to Municipalities within the LUBGWMA based on relative population size as of the last census, to undertake any other projects relating to ensuring or providing clean and sustainable water supplies." Agreement, ¶ VI.A.5. This Court will ensure that any fees are reasonable, so no collusion exists.

Additionally, the Parties fully disclosed the existence of any supplemental agreements, including the confidential Supplemental Agreement on Requests for Exclusion regarding ADS's right to terminate the Settlement upon meeting a specified opt-out threshold. *See, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 948 (9th Cir. 2015) (keeping specific opt-out thresholds confidential in class action settlement is a permissible practice).

**F.    The Settlement Agreement was negotiated at arm's length**

Over the course of four months, the parties engaged in arm's-length negotiations overseen by nationally recognized mediator Lester J. Levy, Esq., who has mediated multiple major environmental class actions. The parties exchanged information on the facts and claims at issue

PAGE 28 - JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

and engaged in two full-day, in-person mediation sessions. *See* Berman Decl. ¶¶ 15–16. Continued

negotiations between Plaintiffs' Counsel and ADS's counsel were overseen and facilitated by Mr.

Levy. Arm's-length negotiations can be further demonstrated by satisfaction of factors such as the

non-collusive nature of negotiations and the stage of proceedings. *See In re Extreme Networks,*

*Inc. Sec. Litig.*, 2019 WL 3290770, at *7 (N.D. Cal. July 22, 2019) (noting overlap with *Hanlon*

factors).

**G.     The release of claims is reasonable**

The Agreement defines the "Released Parties" in part as "ADS and its current, former, and

future direct and indirect parents, subsidiaries, divisions, corporate affiliates, and predecessors and

successors of any kind . . . ." Agreement ¶ I.LL.

The Agreement then defines the scope of Released Claims, in part, as follows:

> Upon the Effective Date of the Agreement, Plaintiffs and any and
> all Settlement Class Members agree to a waiver and release of
> claims in ADS's favor to the broadest extent permitted by law
> ("Released Claims").
>
> At minimum, Plaintiffs and Settlement Class Members expressly,
> intentionally, voluntarily, fully, finally, irrevocably and forever
> release, relinquish, waive, compromise, settle, and discharge the
> Released Parties from each and every past, present, and future claim
> and cause of action, including any form of relief or liability, known
> or unknown, that is or could have been asserted in the Action
> (including the RCRA Notice of Intent sent to ADS) or that arises out
> of or is related to, either directly or indirectly, in whole or in part,
> any condition, discharge, or operation at or thing undertaken, done,
> or omitted to be done in connection with any ADS Facility operated
> in or around the LUBGWMA, including cooling water discharges,
> that is alleged to contribute to groundwater, surface water, or
> drinking water contamination.

*Id.* ¶ X.A. The Released Claims do not include "any personal injury claims arising from nitrogen

or nitrates in the groundwater." *Id.*

The release terms are reasonable. "A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'" *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008)). *Accord*, *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1124 (9th Cir. 2020); *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F.App'x 560, 562 n.3 (9th Cir. 2018). And the Ninth Circuit has explained that a "class settlement may also release factually related claims against parties not named as defendants[.]"); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) (citations and internal quotation marks omitted). A California district court recently relied on *Reyn's* in finding that the "release of claims against [non-party] Division I member institutions and the College Football Playoff is not improper because the released claims are factually related to those against Defendants given that the Division I institutions and the College Football Playoff are affiliated with Defendants." *In re College Athlete NIL Litig.,* at 1011 (footnote omitted). The district court cited *Eisen v. Porsche Cars N. Am., Inc.*, 2014 WL 439006, at *9 (C.D. Cal. Jan. 30, 2014), which explained that "[r]eleases of non-parties in class action settlements are readily approved and enforced" because "[n]o defendant would agree to a release that permitted plaintiffs to continue to initiate litigation against individuals or entities related to the defendant."

Under these standards, the release terms are reasonable.

## H. The covenant not to sue and proposed Bar Order are reasonable

The Parties request that the Court preliminarily approve the contribution protection and proposed Bar Order provisions.  *See* Agreement ¶ X.B. Oregon law provides that a good faith settlement may grant contribution protection "[w]hen a covenant not to sue or not to enforce

judgment is given in good faith to one of two or more persons liable in tort for the same injury to person or property . . . or claimed to be liable in tort for the same injury . . . ." Or. Rev. Stat. § 31.815(1) (2025). The covenant not to sue "discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor." *Id.* The claimant must "give notice of all of the terms of the covenant to all persons against whom the claimant makes claims." Or. Rev. Stat. § 31.815(2).

The $20.5 million paid in settlement and the arm's-length negotiations overseen by mediator Lester J. Levy, Esq. demonstrate that the settling parties have entered into the covenant in good faith. *See AmeriPride Servs. Inc. v. Valley Indus. Servs., Inc.*, 2007 WL 1946635, at *3–4 (E.D. Cal. July 2, 2007) (holding that "arm's length negotiations among sophisticated entities represented by counsel and with the assistance of a professional mediator" was indicative of a good-faith settlement, and that "the settling parties are entitled to an order protecting them from contribution actions brought by third parties"). Plaintiffs will provide notice of the Bar Order to all persons against whom they have made claims.

Plaintiffs and ADS also request the Court to enter an order barring and enjoining all Persons, including without limitation any non-settling defendants in the Action, from asserting any contribution or indemnity claims against the Released Parties consistent with Section X.B.3 of the Agreement ("Bar Order"). *See* Agreement ¶ X.B.3. Bar orders are an appropriate and often essential component of complex, multi-defendant settlements. *See Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1229 (9th Cir. 1989); *Fluck v. Blevins*, 969 F.Supp. 1231, 1233 (D. Or. Apr. 18, 1997) (Since "[a] settling defendant has no assurances that the non-settling defendants won't later seek contribution . . . the court will enter an order barring any claims against the settling defendants for contribution."). They are particularly appropriate in cases like this one, where Plaintiffs bring

claims under both federal environmental and state laws. *AmeriPride*, 2007 WL 1946635, at *2 ("Under federal law, particularly in CERCLA cases . . . district courts have approved settlements and entered bar orders.") (citations omitted). And bar orders have been repeatedly approved by courts in this District when they provide for a reduction in the amount of any judgment that will be collected from any non-settling defendants. *See, e.g.*, *Anderson v. Davis Wright Tremaine LLP*, 2023 WL 6003862, at *4–5 (D. Or. Sep. 5, 2023) (approving contribution claims bar order in class action settlement); *Ciuffitelli v. Deloitte & Touche LLP*, 2019 WL 1441634, at *6 (D. Or. Mar. 19, 2019) (no "dispute that a contribution claims bar is appropriate, and that entering a bar order is within the court's authority").

Here, the Bar Order provision of the Agreement protects the rights of non-settling defendants by providing that Plaintiffs will reduce the amount of any verdict or judgment against any other person by the share paid under this Settlement. Agreement ¶ X.B.2.b. It further requires that the Bar Order itself provide that any judgment or award obtained against a non-settling defendant will be reduced by an amount or percentage sufficient to compensate non-settling defendants for the loss of any barred claims against ADS. *Id.* ¶ X.B.3.d.

## VIII.   THE PARTIES REQUEST THAT THIS COURT DIRECT NOTICE TO THE SETTLEMENT CLASS

Rule 23(c)(2)(B) states that when a court certifies a Rule 23(b)(3) class, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(c)(2)(B) further states that the "notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who

requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).

### 1.    The proposed Notice is the best notice that is practicable

The Notice Plan calls for direct notice to every LUBGWMA resident for whom mailing addresses are reasonably available. Azari Decl. ¶¶ 9–12 & Attachment 1. It also calls for robust publication notice, which will include geo-targeted digital advertisements on Google Display Network and widely-used social media platforms, as well as notices in local newspapers *The Oregonian*, the *East Oregonian*, and the *North Morrow Times*. Azari Decl. ¶¶ 13–25.

The digital advertising and newspaper notices will direct the Settlement Class to the Settlement Website, where they will be able to obtain detailed information about the Settlement and review key documents, including the Settlement Agreement and the Long Form Notice. *Id.* ¶ 26. The Long Form Notice clearly outlines the process and deadline for LUBGWMA residents to submit a Request for Exclusion to opt out of the Settlement. *Id.* Attachment 4 at 6. The process and deadline for filing objections to the Settlement are similarly provided in the Notice. *Id.* at 7.

### 2.    The proposed Notice clearly and concisely provides the required information in plain, easily understood language

"Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *In re Hyundai*, 926 F.3d at 567 (citation omitted). In *Demmings v. KKW Trucking, Inc.*, 2018 WL 4495461, at *3 (D. Or. Sept. 19, 2018), this Court approved class notice that provided sufficient information about twelve matters. The Notice proffered by the Settlement Administrator provides the information listed in Rule 23(c)(2)(B) and described in *Demmings* by:

1.   providing a summary of the action and the claims asserted (*see* Notice at 2);

2.   clearly defining the Settlement Class (*Id*. at 2);

3. describing the material terms of the Agreement (*Id*. at 3–4);

4. stating that no affirmative action is required to receive the benefit of class membership but informs Persons in the Settlement Class that they can opt out of the Settlement Class (*Id*. at 4);

5. describing the release of claims should Persons choose to remain in the Settlement Class (*Id.* at 4);

6. informing Settlement Class Members how to object to the Agreement and the deadline to submit any objections (*Id.* at 6–8);

7. instructing Settlement Class Members how to object to the requested attorney's fees, expenses, and service award and the deadline to submit any objections (*Id.* at 7);

8. listing the date, time, and location of the Fairness Hearing (*Id*. at 8);

9. providing the settlement website and the telephone number from which Settlement Class Members can obtain additional information about the Agreement (*Id.* at 9);

10. listing contact information for the Settlement Administrator and the Court (*Id.* at 9); and

11. stating how Class Counsel and Class Representatives would be compensated (*Id.* at 5).

## IX.   PROPOSED SCHEDULE OF EVENTS AND CONCLUSION

In furtherance of Settlement approval, the Court should set the Fairness Hearing date and time. Other deadlines will be determined based on the Fairness Hearing date. The Parties propose the following schedule:

| | |
|---|---|
| **Implementation of Notice Plan**. Deadline for the Settlement Administrator to substantially complete implementation of Notice pursuant to the Notice Plan | Within thirty (30) days of the date of the Preliminary Approval Order. |

| | |
|---|---|
| and this order.  The date Notice is issued to the Settlement Class shall be the "Notice Date." | |
| **Response Deadline**.  Deadline for Persons in the Settlement Class to submit a Request for Exclusion. | Within sixty (60) days of the Notice Date. |
| **Final Report on Request for Exclusion**.  Deadline for the Settlement Administrator to submit the final list of all Requests for Exclusions to counsel for the Parties and the Court. | Within seven (7) days of the Response Deadline. |
| **Motions for Fee Award and Service Awards**.  Deadline for Class Counsel to file any motions for Fee Award and Service Awards. | No later than fifteen (15) days before the Objections Deadline. |
| **Objections Deadline**.  Deadline for the Settlement Class Members to submit Objections. | No later than ninety (90) days after the Notice Date. |
| **Response to Objections**.  Deadline for Parties to respond to Objections. | No later than the deadline for Parties to file any motions for final approval. |
| **Settlement Administrator Declaration(s) Regarding Notice Plan**.  Deadline for Settlement Administrator to file declaration(s) attesting to compliance with the Notice Plan and applicable provisions in the Preliminary Approval Order. | No later than the deadline for Parties to file any motions for final approval. |
| **Joint Motion for Final Approval**.  Deadline for Parties to file any motions for final approval. | No later than forty-five (45) days before the Fairness Hearing. |
| **Fairness Hearing**.  The date, time, and location of Fairness Hearing will occur no sooner than one hundred and eighty (180) days from the date of the Preliminary Approval Order. | **Date**: _____<br><br>**Time**: _____<br><br>**Location**: _____ |

The Parties respectfully request that this Court grant this motion and enter the proposed order submitted herewith.

DATED:  March 31, 2026            Respectfully submitted,

By: */s/ Michael A. Bliven*_____
Michael A. Bliven, Oregon State Bar No. 942510
BLIVEN LAW FIRM, PC
704 S. Main

Kalispell, MT 59901
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
mike@blivenlawfirm.com

Steve W. Berman (*pro hac vice forthcoming*)
Meredith S. Simons (*pro hac vice forthcoming*)
Sydney Thomas (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com; merediths@hbsslaw.com;
sydney.thomas@hbsslaw.com

Robert F. Dwyer, III, Oregon State Bar No. 984197
BLIVEN LAW FIRM, PC
202 North Main Street, Suite 1
Boardman, OR 97818
Telephone: (406) 755-6828
Facsimile: (406) 755-6829
rdwyer@blivenlawfirm.com

John Heenan (*pro hac vice application forthcoming*)
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
john@lawmontana.com

*Attorneys for Plaintiffs and the Proposed Class*


By: */s/ David C. Weber*
David C. Weber, Oregon State Bar No. 150073
Augustus E. Winkes, Oregon State Bar No. 223347
Casey T. Clausen, Oregon State Bar No. 232287
BEVERIDGE & DIAMOND, PC
600 University Street, Suite 1601
Seattle, WA 98101-3109
Telephone: (206) 315-4800
dweber@bdlaw.com; awinkes@bdlaw.com;
cclausen@bdlaw.com

Nima Mohebbi (*pro hac vice forthcoming*)

Brooklyn Hildebrandt (*pro hac vice forthcoming*)
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9648
nima.mohebbi@sidley.com; bhildebrandt@sidley.com

*Attorneys for Amazon Data Services, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,928 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

By: */s/ Michael A. Bliven*
Michael A. Bliven